## STATE OF CONNECTICUT *v.* WALLACE JOYCE
## (SC 15394)

Callahan, C. J., and Borden, Norcott, McDonald and Peters, Js.

Argued September 23—officially released November 25, 1997

*William H. Cashman,* for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's

attorney, and *Michael A. Pepper*, assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant appeals from a judgment of conviction of arson in the first degree in violation of General Statutes § 53a-111 (a) (4)[1] rendered after a jury trial. He appeals directly to this court pursuant to General Statutes § 51-199 (b).[2]

The defendant originally was convicted of the same crime in 1990,[3] but on appeal, this court concluded that the state's chemical testing of the defendant's burned clothing without a warrant constituted an unreasonable search in violation of article first, § 7, of the state constitution.[4] *State* v. *Joyce*, 229 Conn. 10, 27–28, 639 A.2d 1007 (1994). We reversed the defendant's conviction and ordered a new trial. After our decision in that case, the state applied for and obtained a search warrant to test the defendant's clothing, which was still in the custody of the Superior Court clerk's office.

The defendant now contends, on a number of grounds, that the trial court improperly failed to suppress the results of the chemical analysis conducted

---

[1] General Statutes § 53a-111 provides in relevant part: "Arson in the first degree: Class A felony. (a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and . . . (3) such fire or explosion was caused for the purpose of collecting insurance proceeds for the resultant loss; or (4) at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury. . . ."

[2] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[3] The defendant was acquitted of violating § 53a-111 (a) (3). See footnote 1 of this opinion.

[4] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to

pursuant to the search warrant in violation of the fourth amendment to the United States constitution and article first, § 7, of the state constitution. The defendant also claims that: (1) the state was collaterally estopped from introducing evidence of insurance proceeds as a motive for the defendant to commit arson; (2) the state's failure to preserve the contents of a gasoline can found on the premises violated his right to due process under the state and federal constitutions; (3) the trial court improperly restricted the defendant's closing argument in violation of his sixth amendment right to effective counsel; (4) the trial court improperly precluded him from cross-examining the fire marshall regarding the adequacy of the investigation of a third party; and (5) there was insufficient evidence to support his conviction. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On January 29, 1990, Patricia Altrui and John Donroe were sitting in the living room of their home at 128 Maple Street, East Haven. Their living room has a picture window that overlooks 125 Maple Street. The house at 125 Maple Street had been unoccupied since the death of its owner, Lawrence Joyce, the defendant's father. At approximately 3:45 p.m., Altrui noticed that the front door to the house was partially open and that it remained open for approximately ten minutes. At approximately 4 p.m., Donroe also observed that the front door was open. It remained open for approximately two to three more minutes before he heard a "whooshing" sound. Altrui heard the sound as well. Both Altrui and Donroe looked across the street and saw an orange glow in the picture window of the house and a man in flames run out of the house and down the embankment to the river. Firefighters and paramedics arrived in response to a 911 call by Altrui and Donroe

seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

reporting that there had been an explosion at 125 Maple Street. When firefighter paramedic Charles Licata arrived, the defendant was standing in a nearby river, waist deep in water. The defendant appeared to be severely burned. When Licata asked him what had happened, the defendant stated that he had entered the house and that there was an explosion. He was not sure if he had been blown out of the house, or if he had run out of the house to the river. Licata helped the defendant out of the water and up onto an embankment. The defendant's clothing was burned and smoldering. He had first, second and third degree burns over approximately 40 percent of his body. His hands were degloved, meaning that the skin was intact but was hanging off his hands. Licata cut off all the defendant's clothing in order to treat his injuries and placed it on the ground by the side of the road. Licata told Detectives Paul Hemingway and Bruce Scobie that the defendant's clothing had been left by the side of the road. After being treated at the scene, the defendant was transported by ambulance to Yale-New Haven Hospital. Scobie put the clothes in the trunk of a police car so that they would not be lost or thrown out.

Licata and Hemingway rode in the ambulance with the defendant to the hospital. In the emergency room, Hemingway identified himself and asked the defendant what had happened. The defendant said he had opened up the door and there was an explosion. Hemingway then asked the defendant if he had a car. The defendant stated that he had a pickup truck and that it was parked in the parking lot of the Professional Building on Route 80 in East Haven. Hemingway asked the defendant why the car was parked elsewhere, and the defendant responded that he had experienced mechanical problems. The conversation lasted only one minute because of the defendant's condition. Hemingway also spoke

with the defendant's wife and informed her about the fire and the vehicle.

Pursuant to a search warrant, the clothes were taken to the state laboratory to be tested.[5] A gas chromatography analysis was performed on the defendant's clothing on January 12, 1995. The presence of gasoline was found on the defendant's jeans, a boot and his belt. Prior to trial the defendant moved to suppress the results of the tests. After an evidentiary hearing, the trial court denied the motion.

During trial, the defendant testified that on the day of the fire, he was working as a handyman in Clinton. He left for home at 3:25 p.m., driving on Interstate 95 to the Cedar Street exit. After he exited the highway and entered the hilly section of Cedar Street, his truck began to buck heavily. It continued to buck as he drove along Route 80. He pulled off Route 80 and parked his vehicle at the Professional Building. The defendant then walked to the house at 125 Maple Street, which was two tenths of one mile away, to call his family for a ride. Upon reaching the house, he noticed that the pantry window was open and that there was a ladder leaning against the side of the house. After unlocking the door and disengaging the alarm, he turned on the dimmer switch and immediately thereafter flames hit him.

The jury found the defendant guilty as charged. Thereafter, the trial court denied the defendant's motions for acquittal and a new trial. This appeal followed. Additional facts will be discussed as they become relevant in the context of the defendant's specific claims.

---

[5] The warrant was served on the clerk's office in New Haven Superior Court where the clothes had been kept as exhibits in evidence containers since the first trial in 1990.

## I

The defendant claims that the trial court improperly failed to suppress the results of the 1995 gas chromatography tests of his clothing. The defendant argues that the chemical analysis was derived from the illegal seizure of his clothing, and should be excluded as fruit of the poisonous tree. See *Wong Sun* v. *United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Specifically, the defendant contends that: (1) the warrant affidavit contained references to the first chemical analysis; (2) the state's retention of the clothing following our decision in *State* v. *Joyce*, supra, 229 Conn. 10, constituted an illegal seizure; and (3) the initial transmittal of the clothing in 1990 to the state laboratory for chemical analysis was an illegal seizure that tainted the subsequent testing.[6]

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . Practice Book § 4061; *State* v. *Oquendo*, 223 Conn. 635, 645, 613 A.2d 1300 (1992); *State* v. *Kyles*, 221 Conn. 643, 660, 607 A.2d 355 (1992). [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Colvin*, 241 Conn. 650, 656, 697 A.2d 1122 (1997).

The defendant first claims that the affidavit in support of the warrant contained evidence derived from the

---

[6] Because the defendant has not provided a separate and distinct analysis of his search and seizure claim under the state constitution, we address only his federal constitutional claim. See *State* v. *Robinson*, 237 Conn. 238, 243 n.5, 676 A.2d 384 (1996); *State* v. *Hinton*, 227 Conn. 301, 322 n.23, 630 A.2d 593 (1993); *State* v. *Gonzalez*, 206 Conn. 391, 393–94 n.2, 538 A.2d 210 (1988).

original illegal search. Additionally, he claims that the evidence is not admissible under the independent source doctrine because, with the offending references removed, the warrant to transmit the clothing for testing was not supported by probable cause. We disagree.

At the suppression hearing, the trial court, sua sponte, excised references to the illegal search contained in the warrant affidavit.[7] The court held that, without the references to the illegal search, the warrant nonetheless contained sufficient lawfully obtained evidence to establish probable cause to test the defendant's clothing.

Our disposition of this issue turns on the application of the independent source doctrine. It is well recognized that "the exclusionary rule has no application [where]

---

[7] The trial court stated that it did not consider the following paragraphs from the affidavit:

"On January 30, 1990, Fire Marshall [Frederick] Brow transported wood and carpet samples from the fire scene, as well as [the defendant's] clothing to the state forensic laboratory in Meriden for chemical testing with the exception of [the defendant's] jeans and undershirt, which he transported two days later. A report dated February 29, 1990 from the state lab indicated that analysis of the submitted items revealed the 'presence of a petroleum based distillate similar to gasoline' on the fire scene samples and on the shirt, shoes, socks, and jeans worn by [the defendant]. This report was signed by Jack Hubbal, Ph.D., the leading criminalist with the lab.

"[The defendant] was arrested for arson by a warrant issued on March 3, 1990.

"Jury selection for this trial began in October of 1990 in New Haven Superior Court, part A, 235 Church Street, New Haven. At trial, Jack Hubbal testified regarding the analysis conducted on [the defendant's] clothing and his findings.

"[The defendant's] clothes were introduced by the State as full exhibits. [The defendant] was convicted on November 27, 1990 of Arson, First Degree. General Statutes § 53a-111 (a) (4). [The defendant] appealed and the Appellate Court affirmed. The Supreme Court granted certification and reversed the conviction holding that the warrantless chemical analysis of [the defendant's] clothing constituted an unconstitutional search under article first, § 7, of the state constitution and should have been suppressed. *State* v. *Joyce*, [supra, 229 Conn. 10]."

the [g]overnment learned of the evidence from an independent source." (Internal quotation marks omitted.) *Segura* v. *United States*, 468 U.S. 796, 805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984); see *Wong Sun* v. *United States*, supra, 371 U.S. 485; *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 392, 40 S. Ct. 182, 64 L. Ed. 319 (1920). "Independent source, in the exclusionary rule context, means that the tainted evidence was obtained, 'in fact,' by a search untainted by illegal police activity. *Murray* v. *United States*, 487 U.S. 533, 539, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988)." *State* v. *Vivo*, 241 Conn. 665, 672–73, 697 A.2d 1130 (1997). The doctrine is based on the premise that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred. . . . In the case of a search conducted pursuant to a search warrant, [t]he two elements that must be satisfied to allow admission [under the independent source doctrine] are: (1) the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct.[8] *United States* v. *Johnson*, 994 F.2d 980, 987 (2d Cir. 1993); *Murray* v. *United States*, supra, [542]." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Vivo*, supra, 672–73.

With these principles in mind, our inquiry turns to whether the lawfully obtained evidence in the warrant is sufficient to establish probable cause. See *State* v.

---

[8] The defendant does not argue that the decision to seek the warrant was prompted by the results of the chemical tests. Clearly, the state's decision to seek a warrant was a result of our holding in *State* v. *Joyce*, supra, 229 Conn. 10. Accordingly we limit our discussion to the first element.

*Ostroski,* 201 Conn. 534, 544, 518 A.2d 915 (1986). In the application for the search and seizure warrant, the affidavit disclosed, inter alia, the following facts.[9] The house at 125 Maple Street was unoccupied at the time of the fire and had been owned by the defendant's deceased father. At approximately 4:05 p.m., Donroe, a neighbor, noticed that the door was partially open. He observed the house for a few minutes and then the explosion occurred. The defendant was seen running from the burning house with his clothes on fire. The defendant told Donroe, who came to assist him, and he later told Hemingway, that the explosion had occurred when he opened the door. The defendant suffered first, second and third degree burns on the front part of his body, including his hands, face, chest and legs. His clothes were cut off in order to facilitate his medical treatment and were left on the street. Scobie collected the clothes with the intention of returning them to the defendant. At the hospital, the defendant told Hemingway that he had left his vehicle in a parking lot due to mechanical problems and had walked to 125 Maple Street. The parking lot is approximately five blocks from the house. The defendant's vehicle was parked within 500 feet of a public pay phone and a fire department, where a phone was available.

There was no sign of forced entry, and the alarm system, which was in operation, did not sound. The defendant had keys to both the door and the alarm. Upon entering the house, the Fire Marshall Frederick Brow detected the odor of gasoline. Five separate and distinct points of fire origin were discovered, with one being in the first floor living room. "Knock out plugs" had been removed and candles had been placed in the holes. Brow classified the fire as an arson.

---

[9] The defendant does not contest that these facts were established independent of the initial, illegal search.

It is well settled that "[p]robable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . Findings of probable cause do not lend themselves to any uniform formula because probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. . . .

"In determining the existence of probable cause to search, the issuing magistrate assesses all of the information set forth in the warrant affidavit and should make a practical, nontechnical decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . We view the information in the affidavit in the light most favorable to upholding the magistrate's determination of probable cause. . . . In a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the [issuing judge's] determination." (Internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 231–32, 690 A.2d 1370 (1997).

The affidavit stated that Brow concluded that the fire was an arson. The affidavit also revealed that the witnesses' account of the timing of the explosion squarely contradicted the defendant's. There was no sign of forced entry and the defendant had keys to the house and alarm system, which did not sound. It could be inferred that his explanation for parking his vehicle in a parking lot and walking to the house to use the phone was implausible in light of the access he had to pay phones and the short distance he had to drive to get to the house, coupled with the fact that he had

already driven the vehicle twenty-one miles. We agree with the state that the cumulative effect of this information sufficiently established the requisite probable cause that the defendant's clothing contained evidence linking him to the arson.

The defendant next claims that the state's possession of his clothing after our decision in *Joyce* constituted an illegal seizure.[10] The defendant reads our decision in *Joyce* to mandate that his April 16, 1990 motion to suppress should have been granted. He reasons that the decision implicitly required the *return* of his clothing, rather than simply the suppression of the first test results, because the motion to suppress requested the return of the clothing. Therefore, he asserts the failure to return the clothing after the decision was in violation of this court's holding, and constituted an illegal seizure.

The defendant offers no authority for the novel proposition that, despite our silence on the matter, our decision in *Joyce* granted all the forms of relief requested in the underlying procedural motion. The plain language of our decision in *Joyce* was limited to the determination of whether the chemical analysis constituted an illegal search. We decline the defendant's invitation to read into our decision an order to return the clothing not contained in, nor supported by, the text.

The defendant's final argument with regard to the motion to suppress is that the initial transfer of his clothing to the state laboratory in 1990 was an illegal seizure and that the subsequent possession and testing were the fruit of the poisonous tree.[11] Specifically, the defendant maintains that "the state would not have had

---

[10] The clothing remained in the clerk's office since the trial in 1990. See footnote 5 of this opinion. We note that there is no evidence that the defendant requested the return of the clothing after our decision in *Joyce*.

[11] The trial court did not make a determination as to whether the initial transfer of the clothing to the state laboratory constituted an illegal seizure.

the clothing at all, but for that initial illegal seizure." The defendant concedes that when the police initially took possession of the clothing, it was to prevent theft or loss and was pursuant to their community caretaking function. *Cady* v. *Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973); *State* v. *Tully*, 166 Conn. 126, 136–38, 348 A.2d 603 (1974). The defendant argues, however, that the illegal seizure occurred when the detective delivered the items to Brow to take to the state laboratory for chemical analysis. In *Joyce*, we did not reach the issue of whether the transmittal of the clothing to the laboratory for testing, while in the lawful custody of the police under their community caretaking function, constituted a seizure. *State* v. *Joyce*, supra, 229 Conn. 18 n.11. Because we conclude that there was an independent basis for the possession and testing of the clothing, we refrain from reaching the issue we left open in *Joyce*.

The defendant argues that the clothing must be returned to him in order to effect a constitutional reseizure, and he offers *United States* v. *Silvestri*, 787 F.2d 736, 739 (1st Cir. 1986), cert. denied, 487 U.S. 1233, 108 S. Ct. 2897, 101 L. Ed. 2d 931 (1988), as authority for this proposition. In that case, the Court of Appeals for the First Circuit stated: "Tangible objects . . . are susceptible to seizure and once seized cannot be cleanly reseized without returning the objects to private control." Id. The defendant contends that the United States Supreme Court adopted this principle in *Murray* v. *United States*, supra, 487 U.S. 541–42. In response, the state argues that the Supreme Court rejected the "deseizure" requirement of *Silvestri*, and held instead that the independent source doctrine applies equally to the reseizure of tangible evidence. Id. The state contends that whether the initial seizure was illegal is irrelevant to the admissibility of the challenged evidence during the retrial because it had an independent source,

namely, a warrant supported by probable cause, for the possession and testing of the clothing. We agree with the state.

We consider *Murray* instructive in our consideration of the defendant's claim. In *Murray*, government agents illegally entered a warehouse and saw in plain view burlap-wrapped bales they suspected contained marijuana. They did not mention the prior entry and did not rely on observations made during that entry in their application for a subsequent warrant. The Supreme Court held that so long as the knowledge that the marijuana was in the warehouse existed at the time of the entry pursuant to the warrant and "was not the result of the earlier entry there is no reason why the independent source doctrine should not apply." Id., 541.

The relevant language in *Murray* regarding the reacquisition of tangible evidence previously illegally seized provides as follows: "The First Circuit has discerned a difference between tangible and intangible evidence that has been tainted, in that objects 'once seized cannot be cleanly reseized without returning the objects to private control.' *United States* v. *Silvestri*, [supra, 787 F.2d 739]. It seems to us, however, that reseizure of tangible evidence already seized is no more impossible than rediscovery of intangible evidence already discovered. . . . So long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession) there is no reason why the independent source doctrine should not apply." *Murray* v. *United States*, supra, 487 U.S. 541–42.

The defendant argues that *Murray* indicates that, where the state does not relinquish an illegally obtained possession, a later lawful seizure is unattainable because there is no "attenuation of th[e] initial illegality . . . ." Even if we were to assume, arguendo, that an

illegal seizure arose from the transmittal of the clothing to the state laboratory, we do not construe *Murray* necessarily to require the return of the defendant's clothing in order to effect a constitutional seizure. Rather, in the circumstances of this case "the ultimate question" posed by *Murray* is whether the search and seizure pursuant to a warrant were "in fact a genuinely independent source" of the 1995 gas chromatography test results. Id., 542. We already have answered this inquiry in the affirmative previously in this opinion, wherein we concluded that the operative facts in the affidavit were all in the possession of the authorities before the allegedly illegal seizure and those facts constituted probable cause to support the warrant. Moreover, the suppression of the chemical analysis is not warranted because the defendant's clothing were not seized as a result of alleged police misconduct. Here, the search warrant, supported by probable cause unrelated to any purported illegal conduct by the police, constituted an independent source. We conclude, therefore, that the trial court properly denied the defendant's motion to suppress.

Further, we note that "[t]he defendant's position contravenes the exclusionary rule's purpose of ensuring fairness and balancing the interests of the state and the defendant. Fairness can be assured by placing the State and the accused in the same positions they would have been in had the impermissible conduct not taken place. . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." (Citation omitted; internal quotation marks omitted.) *State* v. *Colvin*, supra, 241 Conn. 660.

If we were to adopt the defendant's position and suppress the chemical analysis as the fruit of an illegal seizure, "we would place the police in a worse position

than they would have been if the allegedly unlawful police conduct had not occurred"; id.; because if the allegedly unlawful seizure had not occurred, the police would have been free to obtain a warrant to transmit the clothing to the state laboratory for testing.

## II

The defendant next claims that the trial court was collaterally estopped from admitting evidence of insurance proceeds as a motive for the defendant to commit arson.[12] The defendant contends that, by acquitting him of a violation of § 53a-111 (a) (3), the jury in his first trial necessarily determined that he did not commit arson for the purpose of collecting insurance proceeds. Therefore, he argues, the state should have been precluded from introducing the evidence of insurance proceeds at his second trial. We disagree. As the state aptly points out, the principles of collateral estoppel do not preclude admission of the evidence because motive is not an ultimate issue or element of § 53a-111 (a) (4) and, therefore, the standard of proof regarding the motive is not beyond a reasonable doubt, as it was in the defendant's earlier prosecution under § 53a-111 (a) (3).

As a preliminary matter, we observe that "[i]n a criminal case, collateral estoppel is a protection included in the fifth amendment guarantee against double jeopardy. *Ashe* v. *Swenson*, 397 U.S. 436, 445, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970). Collateral estoppel is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. Id., 443. Collateral estoppel . . . may bar prosecution or argumentation of facts necessarily established in a prior proceeding . . . . To establish whether

---

[12] The house at 125 Maple Street was insured under a homeowner's policy.

collateral estoppel applies, the court must determine what facts were necessarily determined in the first trial, and must then assess whether the government is attempting to relitigate those facts in the second proceeding." (Citations omitted; internal quotation marks omitted.) *State* v. *Hope*, 215 Conn. 570, 584, 577 A.2d 1000 (1990), cert. denied, 498 U.S. 1089, 111 S. Ct. 968, 112 L. Ed. 2d 1054 (1991).

The defendant concedes that motive is not an element of § 53a-111 (a) (4). He contends, however, that under the circumstances of this case, the motive of committing arson for the purpose of collecting insurance proceeds must be proven beyond a reasonable doubt because it is relevant to establishing the defendant as the perpetrator and his intent to commit the crime.

It is axiomatic that the elements of a crime must be proven beyond a reasonable doubt. *United States* v. *Gaudin*, 515 U.S. 506, 509–10, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995). This standard of proof extends to underlying facts deemed essential to proof of an element. "Where a group of facts are relied upon for proof of an element of the crime it is their *cumulative impact* that is to be weighed in deciding whether the standard of proof beyond a reasonable doubt has been met and each individual fact need not be proved in accordance with that standard. It is only where a single fact is essential to proof of an element, however, such as identification by means of fingerprint evidence, that such evidence must support the inference of that fact beyond a reasonable doubt." (Emphasis added.) *State* v. *McDonough*, 205 Conn. 352, 355, 533 A.2d 857 (1987), cert. denied, 485 U.S. 906, 108 S. Ct. 1079, 99 L. Ed. 2d 238 (1988). The defendant argues that his motive falls into this category and already has been resolved by his acquittal.

We begin our analysis with an examination of the statutes. At the defendant's first trial, when he was

charged with arson in violation of § 53a-111 (a) (3), the state had the burden of proving beyond a reasonable doubt that the defendant committed arson "for the purpose of collecting insurance proceeds for the resultant loss . . . ." In this second trial he was charged with a violation of § 53a-111 (a) (4). That section does not require proof of the specific intent of collecting insurance proceeds but, rather, requires proof that "at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury." We have stated that, except where it is specifically an element of the crime, as in § 53a-111 (a) (3), the state does not have to establish a motive to convict an accused of arson. *State* v. *Gray*, 221 Conn. 713, 722, 607 A.2d 391, cert. denied, 506 U.S. 872, 113 S. Ct. 207, 121 L. Ed. 2d 148 (1992); *State* v. *Famiglietti*, 219 Conn. 605, 614–15, 595 A.2d 306 (1991); *State* v. *Ruffin*, 206 Conn. 678, 681, 539 A.2d 144 (1988); *State* v. *Pisano*, 107 Conn. 630, 632, 141 A. 660 (1928). "[T]he state is under no obligation to show a motive of the accused to commit the crime charged. . . . Proof of motive is never necessary to support a conclusion of guilt otherwise sufficiently established, however significant its presence or absence, or its sufficiency, may be as bearing upon the issue of guilt or innocence. . . . The presence or absence of motive . . . is a circumstance to be weighed with other evidence for the jury to consider." (Citations omitted; internal quotation marks omitted.) *State* v. *Ruffin*, supra, 681. Accordingly, if the state offers evidence regarding motive, it need not be proven beyond a reasonable doubt. The trial court was correct in determining that the difference in the relative burdens of proof permitted the admission of this evidence.

## III

The defendant next claims that the failure of the state to preserve the contents of the gasoline can found in the basement of 125 Maple Street denied him a fair trial

in violation of his due process rights under the state and federal constitutions.[13] We disagree.

The following additional facts are relevant to our disposition of this issue. Brow saw and retrieved a red metal five gallon gasoline can from the basement of the house at 125 Maple Street. There was liquid in the can that smelled like gasoline. Brow did not find any other containers on the premises capable of carrying gasoline. He thought it was possible that such a container could have been brought into the house and consumed in the fire. Although Brow could not remember precisely when he brought the gasoline can to the state's attorney's office, he testified that there was liquid in the can at the time. No tests were conducted on the contents of the can. At the time of trial, the can no longer contained any liquid.

The defendant contends that his federal and state constitutional rights were violated by the state's failure to preserve the liquid in the can. Because the record contains no evidence of bad faith on the part of the police in failing to preserve the liquid, as required under the federal standard set forth in *Arizona* v. *Youngblood*, 488 U.S. 51, 56, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988),[14] we focus our analysis on the defendant's state constitutional claim. See *State* v. *Valentine*, 240 Conn. 395, 416–17, 692 A.2d 727 (1997).

"We have recently enunciated the standard for determining whether the failure of the police to preserve evidence constitutes a due process violation

---

[13] The constitution of Connecticut, article first, § 8, provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[14] "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the

under our state constitution. In *State* v. *Morales*, 232 Conn. 707, 727, 657 A.2d 585 (1995), we rejected the federal standard of *Arizona* v. *Youngblood*, supra, 488 U.S. 51, and held that, under our state constitution, the good or bad faith of the police in failing to preserve potentially useful evidence cannot be dispositive of whether a criminal defendant has been deprived of due process of law. Rather, in determining whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the [*State* v. *Asherman*, 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985)] balancing test, weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." (Internal quotation marks omitted.) *State* v. *Valentine*, supra, 240 Conn. 417. Applying these factors to the present case, we conclude that the defendant's due process rights under our state constitution were not violated by the failure of the police to preserve the liquid contents of the can.

First, the liquid in the gasoline can was not material evidence. "The measure of materiality is whether 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " Id., 417–18. In the present case, the defendant argues that the liquid was material to the state's case because, if it was not gasoline, then

---

exculpatory value of the evidence at the time it was lost or destroyed." *Arizona* v. *Youngblood*, supra, 488 U.S. 56–57 n.*.

the gasoline must have been poured prior to the defendant's arrival at the house and, therefore, his presence at the house at the time of the fire was "much less harmful." We are unpersuaded that the liquid constituted material evidence. The defendant's argument that the liquid was "highly relevant" is undermined by the fact that there was no evidence that the defendant ever requested a test. Although the defendant's failure to seek production of evidence does not relieve the state of the obligation to preserve that evidence, "[t]he fact that a defendant failed to request the evidence goes to the issue of materiality and whether the defendant deemed it significant." *State* v. *Morales*, supra, 232 Conn. 712 n.7. The state's theory that the defendant was burned while lighting the fire was plausible regardless of when the accelerant was actually spread. Even if the liquid was not gasoline, that fact does not preclude the possibility that either the defendant poured it at an earlier time and removed the container or used a different container that was then destroyed in the fire. Finally, considering Brow's testimony that the contents of the can smelled like gasoline and that certain of the defendant's clothing tested positive for a substance similar to gasoline, it appears unlikely that the liquid was anything other than gasoline. In light of these circumstances, we agree with the trial court's determination that it was pure speculation that preservation and testing of the liquid would have helped the defendant's case. We conclude that the presence of the liquid at trial would not have been sufficient to cast reasonable doubt on the defendant's guilt.

Second, there was little likelihood of mistaken assessment of the liquid. The trial court properly held that, in light of Brow's testimony, it was improbable that the liquid was anything other than gasoline and, therefore, the possibility of misinterpretation was minimal.

Third, it is clear from the record that the state did not preserve the liquid because it did not consider such evidence a significant factor in the prosecution. The defendant concedes that there is no evidence indicating that the liquid was disposed of deliberately. To the contrary, the trial court noted that the state actually had a "strong interest" to preserve the liquid as it likely would have bolstered its case. The trial court found credible the state's claim that the liquid likely evaporated during the five years since the fire.

Finally, any prejudice to the defendant was minimal. In measuring the degree of prejudice to an accused caused by the unavailability of the evidence, a proper consideration is "the strength or weakness of the state's case, as well as the corresponding strength or weakness of the defendant's case." Id., 727 n.22. The trial court commented that, because the probability was so great that the liquid was gasoline, the defendant "actually benefitted from the absence of the liquid." The court also noted that the defendant thoroughly cross-examined Brow and brought to the jury's attention that the liquid was neither preserved nor tested. In light of the state's other evidence connecting the defendant to the crime and the persuasive evidence indicating that the liquid was gasoline, we conclude that the absence of the liquid did not prejudice the defendant.

IV

The defendant next claims that the trial court improperly restricted defense counsel from commenting in final argument on certain facts that had been elicited from the defendant during redirect examination, thereby violating his right to the effective assistance of counsel under the sixth amendment to the United States constitution.[15] This claim is without merit.

---

[15] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right

The following facts are relevant to our consideration of the defendant's claim. During trial the defendant sought to introduce evidence indicating that he believed that a third party, David Thomas, a named beneficiary of the defendant's deceased father's will and holder of a life estate in the house, had committed the arson. Because of the lack of direct evidence connecting Thomas to the crime, the trial court denied the admission of evidence of third party culpability.[16] During cross-examination, the defendant indicated that he believed that someone else set the fire. After hearing argument, the trial court permitted defense counsel to introduce evidence during redirect examination showing the basis of the defendant's belief. The defendant testified that he believed someone else set the fire because Thomas had told him that he was going to burn down the house. After this testimony, the trial court instructed the jury that the evidence was offered not as third party culpability but to show the defendant's state of mind.[17]

During final argument, defense counsel amplified the defendant's testimony about the threat by Thomas to

. . . to be confronted with the witnesses against him . . . and to have the assistance of counsel for his defense."

[16] The defendant does not challenge this ruling on appeal. The standard for the admissibility of third party culpability evidence in Connecticut is governed by the rules relating to relevancy and requires that the defendant show "some evidence which directly connects a third party to the crime with which the defendant is charged. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." *State v. Boles*, 223 Conn. 535, 548–49, 613 A.2d 770 (1992).

[17] The trial court's complete instruction regarding the evidence provided: "Ladies and gentlemen, this evidence is, once again, not offered for the truth of the matter asserted. It is offered to show the state of mind of this witness and that's the only purpose for which you can use it. And when I say the only purpose [for] which you can use it, there is no direct evidence in this case of third party culpability. And because of that, this is not evidence of third party culpability. Do you understand that?"

burn the house. On the basis that defense counsel was actually arguing third party culpability, the state objected to statements by defense counsel that (1) Thomas did not testify at the trial, and (2) Thomas threatened to burn the house and that is what happened.[18]

We recognize that "[t]he right to the assistance of counsel ensures an opportunity to participate fully and fairly in the adversary factfinding process. . . . The opportunity for the defense to make a closing argument in a criminal trial has been held to be a basic element of the adversary process and, therefore, constitutionally protected under the sixth and fourteenth amendments. . . . Closing argument is an integral part of any criminal trial, for it is in this phase that the issues are sharpened and clarified for the jury and each party may present his theory of the case. Only then can [counsel] . . . argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." (Citations omitted; internal quotation marks omitted.) *State* v. *Arline*, 223 Conn. 52, 63, 612 A.2d 755 (1992).

"[T]he scope of final argument lies within the sound discretion of the court . . . subject to appropriate constitutional limitations. . . . It is within the discretion of the trial court to limit the scope of final argument

---

[18] The specific statements made by defense counsel in final argument, to which the state objected, were:

"Mr. Cashman [Defense Counsel]: . . . Now that statement was never disputed by David Thomas. And you remember when [Michael Pepper, assistant state's attorney] . . . said, 'Well, isn't it your word against Mr. Thomas' word?' And I objected because Mr. Thomas has never said anything in this trial and still hasn't.

\* \* \*

"Mr. Cashman: . . . [The defendant] knows he didn't do it. So of course somebody else had to. And when he testified he said David Thomas. And

to prevent comment on facts that are not properly in evidence, to prevent the jury from considering matters in the realm of speculation and to prevent the jury from being influenced by improper matter that might prejudice its deliberations. . . . While we are sensitive to the discretion of the trial court in limiting argument to the actual issues of the case, tight control over argument is undesirable when counsel is precluded from raising a significant issue." (Citations omitted; internal quotation marks omitted.) Id., 59–60.

The defendant argues that because of the limitations imposed on his final argument, he was unable to rehabilitate his credibility regarding why he believed someone else had committed the crime. We are unpersuaded that the defendant was precluded from raising a significant issue in final argument. The defendant was permitted to testify why he believed someone else committed the crime and counsel was able to comment in final argument about the basis of the defendant's belief. Having already determined that the evidence could not be admitted to prove third party culpability, the trial court did not abuse its discretion by circumscribing counsel's emphasis on Thomas as the culpable party.

V

The defendant's other sixth amendment claim is that the trial court improperly restricted his cross-examination of Brow and Scobie in violation of his right to confront his accusers. The defendant contends that the trial court impermissibly limited his cross-examination of these witnesses regarding their allegedly inadequate investigation of Thomas as the responsible party.

---

he had reason to believe that because of the threat that was made. And I would suggest to you that if somebody said, 'I am going to burn your car,' and then your car was—

"Mr. Pepper: Judge, I've got to continue to object."

On motion of the defendant, the trial court allowed the defendant to make an offer of proof regarding the testimony he sought to elicit from these witnesses. On voir dire examination by the defendant, Brow acknowledged that Thomas had admitted to Scobie and Brow that Thomas had threatened to burn the property. Brow further testified that he could not remember where Thomas said he had been on the night of the fire. The defendant also inquired if Brow knew that Thomas had a life use of the house and was listed as a beneficiary in the will, to which Brow responded in the affirmative. The defendant argued that he was entitled to pursue this line of questioning because it was relevant to his argument that the state's investigation was inadequate and "negligent." The trial court concluded that the proffered evidence should not be admitted because: (1) it was redundant, in that counsel had "already shown to a large degree the ineffectiveness of [the] investigation"; and (2) it constituted evidence of third party culpability without the required direct connection to the crime.

"It is axiomatic that the defendant is entitled fairly and fully to confront and to cross-examine the witnesses against him. . . . The confrontation clause does not, however, suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Barnes*, 232 Conn. 740, 745–46, 657 A.2d 611 (1995). " 'In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial.' " *State* v. *Bova*, supra, 240 Conn. 219. With

these principles in mind, we now turn to the defendant's claim.

We agree with the state that the trial court properly precluded the defendant from pursuing this line of inquiry. The court previously had determined that there was no direct evidence linking Thomas to the crime. The defendant had conducted a thorough cross-examination of Brow about the investigation and had stressed deficiencies in the process such as the failure to fingerprint the gasoline can and to preserve the contents. The trial court properly was concerned about the potential effect of this testimony to confuse the jury. Accordingly, we reject the defendant's claim that the trial court improperly restricted his cross-examination of Brow and Scobie.

## VI

The defendant's final claim is that there was insufficient evidence to support his conviction. He concedes that the fire was deliberately set. He contends, however, that the state failed to establish, beyond a reasonable doubt, that: (1) he was the person criminally responsible for setting the fire; and (2) firefighters at the scene were subjected to a substantial risk of injury. We disagree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt.

. . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . [W]e must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *James*, 237 Conn. 390, 435–36, 678 A.2d 1338 (1996).

Viewing the cumulative effect of all the evidence, we are persuaded that the jury reasonably could have found that the defendant set the fire and was burned when the vapors ignited. It was undisputed that the defendant was the only one present in the house just before the explosion. See *State* v. *Gray*, supra, 221 Conn. 722 (presence of accused shortly before start of fire is probative of identity); *State* v. *Famiglietti*, supra, 219 Conn. 614 (same). His testimony that the explosion occurred as soon as he opened the door contradicted the testimony of Altrui and Donroe who stated that the door was open for some minutes before the explosion occurred. There was medical testimony that the injuries to the defendant's hands were consistent with being in the area of ignition. Chemical analysis revealed that gasoline was present on the defendant's boot, jeans and belt. He parked his vehicle at the Professional Building because it was bucking. A service technician testified that he test drove and physically inspected the vehicle, and could not find any mechanical problems. The state presented evidence that during the time his vehicle was allegedly bucking the defendant passed several service

stations. He walked two tenths of one mile to 125 Maple Street to call his son for a ride when his vehicle was parked approximately 400 feet from a public pay phone. It is reasonable to infer from the jury's verdict that it accepted the testimony offered by the state and rejected the testimony offered by the defendant. Accordingly, we reject the defendant's contention that the evidence was legally insufficient to implicate him in the crime.

The defendant also challenges his conviction on the basis that there was insufficient evidence to prove beyond a reasonable doubt that the fire posed a "substantial risk of bodily injury" as required under § 53a-111 (a) (4). "The statute requires proof of a risk of substantial injury, not serious injury in fact." *State* v. *Famiglietti,* supra, 219 Conn. 615.

Lou Camera, the first firefighter on the scene, testified that when he arrived on the scene there was heavy smoke coming from the front door of the house. He did not know whether the house was occupied, and he assumed there were people inside. He entered alone, with full equipment including air mask and gloves, carrying a water line. There were two fires in the living room, the largest with flames six to seven feet high. There was also a smaller fire in the dining room. Both rooms and the foyer were full of heavy smoke. When he removed his mask, he detected a chemical smell. Upon arrival, Brow investigated the house. In the basement, he saw a red five gallon gasoline can and noticed that the water on the floor had a petroleum shine. He also smelled an odor similar to gasoline. Concerned about the possibility of an explosion, Brow told the firefighters to vacate the house until it could be adequately ventilated. We conclude that the evidence of heavy smoke, gasoline vapors, and the potential for combustion was sufficient for the jury to find beyond a reasonable doubt that firefighters were exposed to a risk of substantial injury.

The judgment is affirmed.

In this opinion BORDEN and PETERS, Js., concurred.

CALLAHAN, C. J., with whom MCDONALD, J., joins, concurring. I concur with the result reached by the majority. I wish to reiterate, however, the opinion expressed in my dissent in *State* v. *Joyce*, 229 Conn. 10, 28, 639 A.2d 1007 (1994), i.e., that the defendant had no reasonable expectation of privacy in his charred clothing that was retrieved by the police from the roadside. I believe, therefore, that the original chemical testing of the defendant's clothing was constitutionally permissible and the results admissible.