******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PRESCOTT, J., concurring. I agree with and join parts II and III of the majority opinion. I concur in the result reached by the majority with respect to the first claim of the defendant, Bennie Gray, Jr., but I write separately because I do not entirely agree with the majority's analysis of the "materiality" prong of the *Asherman/Morales* balancing test. My disagreement, however, largely derives from the lack of consistency and clarity within our *Asherman/Morales* jurisprudence concerning the meaning to be given to the test's materiality prong.

In a criminal case, if the state loses or destroys evidence, it may have deprived the defendant of the opportunity to test that evidence for fingerprints, DNA, or other forensic evidence. Without the evidence to test, the defendant often is unable to evaluate its exculpatory value. The state's failure to provide to the defendant potentially exculpatory evidence that was at one point, but is no longer, within its control may violate the defendant's right to due process of law under our state constitution. See *State* v. *Morales*, 232 Conn. 707, 719, 657 A.2d 585 (1995) (evaluating "whether the failure of the police to preserve potentially [exculpatory] evidence ha[s] *deprived a criminal defendant of due process of law under . . . the . . . state constitution*" (emphasis added)).

In *Morales*, our Supreme Court adopted a four-pronged balancing test that courts are to apply in reviewing a criminal defendant's state due process claim arising out of the state's destruction or loss of potentially exculpatory evidence. See id., 726–27. "[I]n determining whether a defendant has been afforded due process of law under the state constitution, the trial court must . . . [weigh] the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: 'the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence.' *State* v. *Asherman*, [193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985)]." *State* v. *Morales*, supra, 232 Conn. 726–27.

Our courts, however, have employed the term "materiality" to have slightly different meanings in two closely related contexts: (1) in *Asherman/Morales* cases, like the present case, in which the state has failed to preserve potentially exculpatory evidence by losing or destroying it; and (2) in cases involving traditional *Brady* violations where the state has withheld exculpa-

tory evidence from the accused.[1] See id., 714 (differentiating instances in which state failed to preserve potentially exculpatory evidence by losing or destroying it, like in present case, from strict *Brady* violations). Several cases within our *Asherman/Morales* jurisprudence have described the "materiality" prong using the following language: "[E]vidence is material *only* if there is a reasonable probability that," had the evidence been preserved and disclosed to the defense, "the *result of the proceeding would have been different.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Fox*, 192 Conn. App. 221, 237, 217 A.3d 41, cert. denied, 333 Conn. 946, 219 A.3d 375 (2019); see *State* v. *Baldwin*, 224 Conn. 347, 365, 618 A.2d 513 (1993) (same); *State* v. *Richard W.*, 115 Conn. App. 124, 141, 971 A.2d 810 (same), cert. denied, 293 Conn. 917, 979 A.2d 493 (2009); see also *State* v. *Valentine*, 240 Conn. 395, 417–18, 692 A.2d 727 (1997) ("[t]he measure of materiality is whether there is a reasonable probability that," had evidence been preserved and disclosed to defense, "the result of the proceeding would have been different" (internal quotation marks omitted)); *State* v. *Joyce*, 243 Conn. 282, 301, 705 A.2d 181 (1997) (same), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998); *State* v. *Thompson*, 128 Conn. App. 296, 303, 17 A.3d 488 (2011) (same), cert. denied, 303 Conn. 928, 36 A.3d 241 (2012); *State* v. *Barnes*, 127 Conn. App. 24, 32, 15 A.3d 170 (2011) (same), aff'd, 308 Conn. 38, 60 A.3d 256 (2013).

On the other hand, the cases within our *Brady* jurisprudence have described materiality somewhat differently: "Evidence is material when there would be a reasonable probability of a different result if it were disclosed. . . . *A reasonable probability exists if the evidence could reasonably . . . put the whole case in such a different light as to undermine confidence in the verdict.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Komisarjevsky*, 338 Conn. 526, 633–34, 258 A.3d 1166, cert. denied,    U.S.   , 142 S. Ct. 617, 211 L. Ed. 2d 384 (2021); see also *State* v. *Esposito*, 235 Conn. 802, 815, 670 A.2d 301 (1996) (requiring defendant to demonstrate "that the favorable evidence *could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict*" (emphasis added; internal quotation marks omitted)). Under our *Brady* jurisprudence, however, "[m]ateriality *does not require* . . . a demonstration . . . that disclosure of the suppressed evidence would have resulted ultimately in the defendant's *acquittal.* . . . Instead, the operative inquiry is *whether, in the absence of the evidence, the defendant received a fair trial . . . resulting in a verdict worthy of confidence.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Komisarjevsky*, supra, 634; see also *State* v. *Bryan*, 193 Conn. App. 285, 317, 219 A.3d 477 ("[t]he question is not whether the defendant would more likely

than not have received a *different verdict* with the evidence, but whether in its absence he received a *fair trial*, understood as a trial resulting in a verdict worthy of confidence" (emphasis added; internal quotation marks omitted)), cert. denied, 334 Conn. 906, 220 A.3d 37 (2019). Thus, although many of our *Asherman/ Morales* cases define "materiality" using somewhat similar language to that used within our *Brady* jurisprudence, our courts appear to have given two different meanings to the common factor of materiality.

Moreover, within our *Asherman/Morales* jurisprudence, our cases have sometimes confounded the first prong of the balancing test—that is, "the materiality of the missing evidence"; (internal quotation marks omitted) *State* v. *Morales*, supra, 232 Conn. 719; and the fourth prong of the balancing test—that is, "the prejudice to the defendant caused by the unavailability of the evidence." (Internal quotation marks omitted.) Id., 720. In other words, despite the fact that the *Asherman/ Morales* balancing test differentiates between these two prongs, many cases within our *Asherman/Morales* jurisprudence appear to have construed the "materiality of the missing evidence" prong to evaluate "the prejudice to the defendant caused by the unavailability of the evidence." (Internal quotation marks omitted.) Id., 719–20. Accordingly, in several of these cases—including the majority's opinion in the present case—our courts have evaluated, under *Asherman/Morales*' materiality prong, whether the unavailability of the evidence at trial *prejudiced* the defendant. See, e.g., *State* v. *Joyce*, supra, 243 Conn. 301–302 (evaluating, under *materiality* factor, cumulative weight of remainder of state's case against defendant, outside of contested evidence); *State* v. *Fox*, supra, 192 Conn. App. 239 (same); *State* v. *Barnes*, supra, 127 Conn. App. 33 (same).

The inconsistencies *within* our *Asherman/Morales* jurisprudence have resulted in a lack of clarity as to how the materiality prong should be applied. To start, the definition of "materiality" adopted by many cases within our *Asherman/Morales* jurisprudence strays significantly from how the *Asherman* court, as the majority notes, originally defined "materiality." As the majority recognizes, the *Asherman* court "set forth the standard for materiality in cases where evidence was lost or destroyed prior to forensic testing . . . [by holding] that, 'if the state has not tested an item of evidence before its loss or destruction, and no other facts indicate that test results might have proved unfavorable to the defendant, *little more is required* than a showing that the test could have been performed and results obtained which, in the context of the defendant's version of the facts, would prove exculpatory.' "[2] (Emphasis added.) Part I of the majority opinion; see *State* v. *Asherman*, supra, 193 Conn. 725. Thus, by maintaining that evidence is material "*only* if there is a reasonable probability that, had [it] been disclosed to the defense, the *result*

*of the proceeding would have been different*"; (emphasis added; internal quotation marks omitted) *State* v. *Fox*, supra, 192 Conn. App. 237; our courts appear to have retreated from the *Asherman* court's initial, less demanding threshold for materiality.

Additionally, in at least one case following *Asherman*, our Supreme Court evaluated the materiality prong by using an entirely different definition of "materiality." In *State* v. *Estrella*, 277 Conn. 458, 893 A.2d 348 (2006), our Supreme Court initially stated: "The evidence is material *only* if there is a reasonable probability that, had the evidence been disclosed to the defense, *the result of the proceeding would have been different.*" (Emphasis added; internal quotation marks omitted.) Id., 485. Our Supreme Court, however, continued: "*In other words*, the defendant must show that [the evidence] would have been *helpful* to him."[3] (Emphasis added.) Id. In my view, there is a significant difference between evidence that raises a reasonable probability that the defendant would be found not guilty and evidence that would be "helpful" to the defendant's case.

The Supreme Court in *Estrella* ultimately concluded that, because "the defendant [did] not [demonstrate] that [the evidence] would have been *favorable*" to him, its "absence was [not] *prejudicial*" to the defendant and the materiality factor did not weigh in his favor. (Emphasis added.) Id., 486. The *Estrella* court's frequent interchanging of different terms to describe the materiality prong has resulted in inconsistencies between *Estrella* and other *Asherman/Morales* cases, further muddling the proper meaning to be ascribed to *Asherman/Morales*' materiality prong.

In sum, there exists a lack of consistency and clarity, both between our *Brady* jurisprudence and *Asherman/Morales* jurisprudence, and within our *Asherman/Morales* jurisprudence, as to the meaning to be given to the materiality prong of the *Asherman/Morales* balancing test. I encourage our Supreme Court, when provided an appropriate opportunity, to define more fully and definitively "materiality" in *Asherman/Morales* cases or to reformulate the *Asherman/Morales* test to address this lack of clarity.

Nonetheless, in the present case, even if I assume that the first three prongs of the *Asherman/Morales* test—including the materiality prong—weigh in favor of the defendant, the defendant has failed to persuade me that, under the fourth prong of the test, the admission of secondary evidence of the seized cash, in light of its unavailability for testing, caused him prejudice sufficient to reverse the judgment of the trial court. See *State* v. *Morales*, supra, 232 Conn. 723. In my view, even if the defendant's motion to suppress the secondary evidence of the seized cash had been granted, the remaining evidence against the defendant was quite strong.

"The fourth factor of the *Asherman*[/*Morales* balancing] test concerns the prejudice caused to the defendant as a result of the unavailability of the [missing evidence]. In measuring the degree of prejudice to an accused caused by the unavailability of the evidence, a proper consideration is the strength or weakness of the state's case, as well as the corresponding strength or weakness of the defendant's case." (Internal quotation marks omitted.) *State* v. *Morales*, 90 Conn. App. 82, 91, 876 A.2d 561, cert. denied, 275 Conn. 924, 883 A.2d 1250 (2005). In analyzing this prong, our courts have evaluated the strength of the state's case by reviewing the "testimony and exhibits [introduced at trial], *aside from*" the missing evidence. (Emphasis added.) Id., 92; see also *State* v. *Joyce*, supra, 243 Conn. 303 ("[i]n light of the state's *other evidence* connecting the defendant to the crime and the persuasive [other] evidence [the state presented], we conclude that the absence of the [missing evidence] did not prejudice the defendant" (emphasis added)).

Had the jury *not* heard testimony concerning the seized cash, the state's case against the defendant nevertheless was compelling. Brian Drobnak testified at trial concerning his purchase of crack cocaine from the defendant on May 9, 2018. After he was arrested at the Gulf gas station with crack cocaine in his possession and while still at the scene, Drobnak immediately volunteered to speak with the police. He reported to the police that he had purchased crack cocaine from an individual the police quickly identified as the defendant. Drobnak reiterated this version of events in a written statement at the police station[4] and later when he testified at trial. While at the scene, Drobnak also provided to the police the phone number he had contacted to arrange the narcotics transaction. The police confirmed that the phone number provided to them by Drobnak matched a cell phone found in the center console of the defendant's car. Further, Drobnak testified that he had purchased crack cocaine from the defendant on prior occasions.

At trial, Officers Todd Lynch and Jeremy Zelinski corroborated Drobnak's version of the events. Lynch and Zelinski testified that, at the gas station, they observed Drobnak pacing back and forth alongside his vehicle and checking his phone. They did not observe Drobnak purchase gasoline, enter the convenience store at the gas station, or use the air pressure machine nearby. Shortly thereafter, Lynch and Zelinski observed a car, operated by the defendant, pull into the gas station. They watched Drobnak enter the car operated by the defendant, remain in the car for less than one minute, and subsequently exit the vehicle to return to his car. As the majority states, the "limited exchange between Drobnak and the defendant . . . in an area well-known for frequent drug sales" indicated that a

narcotics transaction had taken place between the defendant and Drobnak. Immediately after Drobnak returned to his car, Lynch and Zelinski approached Drobnak's vehicle. They testified that, once they approached the vehicle, they immediately observed Drobnak holding what appeared to be narcotics. Lynch and Zelinski recovered what field testing confirmed to be cocaine from Drobnak's car.

Immediately after the substance was field tested and confirmed as positive for cocaine, Sergeant Gregory Moreau attempted to initiate a motor vehicle stop of the defendant's vehicle by activating the siren and overhead lights of his police cruiser. Demonstrating consciousness of guilt, the defendant did not stop. Moreau used the public address system of his cruiser to instruct the defendant to pull over, and the defendant continued driving forward for another two to four hundred feet before he eventually stopped. The defendant subsequently was placed under arrest and transported to the police station. At the police station, Lynch asked the defendant why he was involved in selling narcotics. In response to Lynch's question, the defendant responded, "that's all I know."

Comparatively, the defendant's theory of the case was significantly weaker than the state's case against him. At trial, the defendant denied selling narcotics to Drobnak. The defendant testified that he had met Drobnak at the gas station to speak about his son's missing cell phone, because the defendant allegedly had left the phone in Drobnak's car a few days prior. The defendant testified that, upon entering the defendant's car, Drobnak requested a financial reward for finding the cell phone. According to the defendant, he denied Drobnak's request and asked Drobnak to exit the car, and Drobnak did so less than a minute after he had entered. The defendant's version of events, as the majority notes, was "largely unsubstantiated" by any other evidence outside of his own testimony. Accordingly, the court's denial of the defendant's motion to suppress the secondary evidence of the cash does not justify reversal of the defendant's conviction under the *Asherman/Morales* standard.

For the foregoing reasons, I respectfully concur.

[1] "[T]o prove a . . . violation [of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)], [a] defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) *that the evidence was material*." (Emphasis added; internal quotation marks omitted.) *State* v. *Komisarjevsky*, 338 Conn. 526, 614, 258 A.3d 1166, cert. denied, U.S. , 142 S. Ct. 617, 211 L. Ed. 2d 384 (2021).

[2] In *Correia* v. *Rowland*, 263 Conn. 453, 820 A.2d 1009 (2003), a habeas petitioner relied on this language; see id., 477 n.23; to argue that "a legal presumption ar[ose] that . . . untested evidence, not preserved by the state, would have [yielded results that would have] exonerated [him]," had it been tested. (Emphasis omitted.) Id., 473–74, 476. Our Supreme Court rejected this argument and stated: "We do not read *Asherman* to support th[at] [the law presumes that the lost or destroyed evidence, if tested, would have exonerated the petitioner]. To the contrary, although this section of *Asherman* does state '[o]n the other hand, if the state has not tested an item of evidence before its loss or destruction, and no other facts indicate that test

results might have proved unfavorable to the defendant, little more is required than a showing that the test could have been performed and results obtained which, in the context of the defendant's version of the facts, would prove exculpatory'; [*State* v. *Asherman,* supra, 193 Conn. 725]; we note that *this passage,* particularly its reference to other facts indicating a test result unfavorable to the defendant, *is merely part of an explication of the balancing process that the court must undertake under both Asherman and Morales.*" (Emphasis added.) *Correia* v. *Rowland,* supra, 477 n.23. In my view, the court's attempt in *Correia* to clarify its prior language in *Asherman* was not entirely successful.

[3] The *Estrella* court also stated that "[e]vidence is material when it is offered to prove a fact directly in issue or a fact probative of a matter in issue." *State* v. *Estrella,* supra, 277 Conn. 484 n.17.

[4] Drobnak testified that, in his written statement, he stated that he had purchased the crack cocaine from "G," whom Drobnak admitted on cross-examination referred to Greg Williams, a mutual acquaintance of Drobnak and the defendant. Drobnak clarified at trial, however, that he had intended to identify the defendant in his written statement, and he testified that there was "no doubt in [his] mind that [the defendant] [was] the man who sold [him] crack cocaine."

———————————————————