STEVEN CORREIA *v.* JOHN G. ROWLAND ET AL.
(SC 16865)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.

454

Argued February 19—officially released May 6, 2003

*Francis T. Mandanici,* assistant public defender, for the appellant (petitioner).

*Nancy L. Chupak,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Linda Howe,* senior assistant state's attorney, for the appellees (respondents).

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether the habeas court properly concluded that the petitioner did not have cause for his failure to raise, at his trial and on direct appeal, a claim that his right to due process of law under article first, § 8, of the constitution of Connecticut[1] was violated by the state's failure to preserve potentially useful evidence. The petitioner, Steven Correia, appeals[2] from the judgment of the habeas court denying his petition for a writ of

---

[1] The due process clause contained in article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

[2] The petitioner appealed from the habeas court's judgment to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

habeas corpus.[3] In this appeal, the petitioner contends that the habeas court improperly: (1) concluded that the petitioner did not have legally sufficient cause for failing to raise the unpreserved evidence issue at trial or on direct appeal, and that the petitioner did not establish that he was prejudiced by the lost evidence; (2) applied a double standard in determining whether the respondent had cause to amend his return; (3) concluded that the petitioner did not prove, by clear and convincing evidence, that he was actually innocent; and (4) excluded the testimony of the petitioner's expert witnesses at the habeas corpus hearing. We affirm the judgment of the habeas court.

The record reveals the following facts and procedural history. The petitioner was charged with sexual assault in the first degree in violation of General Statutes (Rev. to 1981) § 53a-70 (a), two counts of kidnapping in the first degree in violation of General Statutes (Rev. to 1981) § 53a-92 (a) (2) (A) and (B), and robbery in the first degree in violation of General Statutes (Rev. to 1981) § 53a-134 (a) (4). After a jury trial before the court, *O'Keefe, J.*, the petitioner was convicted of all charges, and was sentenced to forty-five years imprisonment.

The petitioner was convicted of charges that arose out of a sexual assault and robbery that had occurred in New Haven in November, 1981.[4] After the assault,

---

[3] The named respondent is Governor John G. Rowland. In response to questioning at oral argument before this court, the petitioner stated that he named Rowland as the respondent because, at the time that he filed the petition for a writ of habeas corpus, the petitioner was not in custody in Connecticut, but was incarcerated in Massachusetts. We need not address the propriety of this procedure because the respondent has not elected to challenge it.

[4] The underlying facts are set forth in the opinion of the Appellate Court from the petitioner's direct appeal. "On November 16, 1981, the victim and her roommate went to the Agora Ballroom in New Haven. They left the bar around 1:30 a.m. and walked to the victim's car located in a nearby parking lot. The victim unlocked the car, got into the driver's seat and unlocked the passenger door. When the roommate got into the front passenger seat, she

the victim went to the Hospital of Saint Raphael (hospi-

saw a man with a gun bending down at the driver's window. She said, 'Oh my God.' The victim turned and saw the [petitioner] pointing a gun at her. The victim offered the [petitioner] money and her car. The [petitioner] responded, 'Shut up and let me in.' The victim unlocked a rear door and let him in the car. The [petitioner] continued to point the gun at the victim. When the victim looked into the rearview mirror, the [petitioner] told her to look straight ahead and drive. At the [petitioner's] direction, the victim drove a few blocks, and was then told to stop the car. The [petitioner] told the victim and her roommate to get out of the car, he told the victim to open the trunk, and then ordered the roommate to get in. The [petitioner] then locked her in the trunk.

"The victim and the [petitioner] got back into the car, the victim in the driver's seat and the [petitioner] in the passenger seat. All the while, the [petitioner] kept the gun pointed at the victim. The [petitioner] demanded her money. The victim told him she had only $5 and that her roommate did not have any money. The victim gave the [petitioner] her $5. The [petitioner] then directed her to continue driving. After she drove a few blocks, he told her to stop and get out of the car. The [petitioner] took her by the arm, with the gun still pointed at her, and led her to a large field. The [petitioner] ordered the victim to remove her jacket and to lay it on the ground. He ordered the victim to remove her clothes and forced her to perform oral sex on him, and then ordered her to lie down. The [petitioner] penetrated the victim vaginally. During the vaginal penetration, the [petitioner] supported himself on his right elbow while he continued to point the gun, held in his right hand, at the victim. The assault lasted between fifteen and twenty minutes. After the assault, the [petitioner] told the victim to get dressed. When she picked up her jacket, her car keys fell to the ground. The [petitioner] and the victim tried unsuccessfully to find the keys. They went to the car to get a flashlight, returned to the field, found the car keys and walked back to the car.

"When they returned to the car, the [petitioner] told the victim to let her roommate out of the trunk. After the roommate was released from the trunk, all three got into the car. The [petitioner] was in the backseat with the gun pointed at the victim. The victim drove until the [petitioner] told her to stop the car. He asked the women for their addresses and phone numbers. They wrote them down and the [petitioner] compared them with their driver's licenses and checkbooks. The [petitioner] ordered the victim to get out of the car. He led her down the street a short distance and threatened her with harm if she went to the police.

"The victim returned to the car and the [petitioner] continued down the street. The victim told her roommate that the [petitioner] had raped her and drove to Saint Raphael Hospital. The roommate told the emergency room staff that the victim had just been raped. The victim was examined and the police were called. Both women gave statements to the police. The next morning the victim looked through numerous photographs but was

tal) for medical evaluation and treatment. At the hospital, the victim's clothes were confiscated, and medical personnel utilized a rape crime kit to examine her body for evidence.[5] One of the purposes of a rape crime kit is to aid in the ultimate identification of the perpetrator. Ann Marie Conneley, the nurse who examined the victim at the hospital, testified at the petitioner's 1992 trial that, upon microscopic examination by the on-duty physician, the cervical smear taken as part of the rape crime kit revealed the presence of multiple motile spermatozoa.

Joel Milzoff, chief toxicologist at the state crime laboratory (state lab), testified at the petitioner's trial that the state lab had received the rape crime kit from the New Haven police on November 23, 1981, approximately five days after the attack. Milzoff testified that all of the materials submitted with the rape crime kit were returned to the New Haven police in November, 1982, upon their request because "the case was disposed of"; he also testified that his file indicated that the victim wanted her clothing returned. Milzoff further testified that there was no analysis or report generated about any testing of the rape crime kit materials; some partial testing had been performed on the clothing, but it was never completed. He also testified that the rape crime kit materials remained, in effect, untested by the

unable to identify anyone.

"In 1986, five years later, the victim was contacted by Sergeant Michael Sweeney of the New Haven police department who told her he had some photographs he wanted to show her. Sweeney showed the victim an array of photographs. The victim immediately identified the [petitioner] as the man who had kidnapped and raped her.

"At trial, in 1992, the jury convicted the [petitioner] on all counts charged." *State* v. *Correia*, 33 Conn. App. 457, 458–60, 636 A.2d 860, cert. denied, 229 Conn. 911, 642 A.2d 1208, cert. denied, 513 U.S. 898, 115 S. Ct. 253, 130 L. Ed. 2d 174 (1994).

[5] The rape crime kit contained slides of materials taken from the victim's body, combings from the victim's pubic hair, cervical smears and the victim's clothing.

state lab.[6] The record indicates that, by the time of the petitioner's trial, all of the rape crime kit materials were lost; indeed, the petitioner's blood also had never been tested by the state.

The petitioner was subsequently convicted of all counts on the basis of identification testimony by the victim and her roommate on the night the victim was assaulted. See footnote 4 of this opinion. The petitioner appealed from that judgment to the Appellate Court, which affirmed the convictions. *State* v. *Correia*, 33 Conn. App. 457, 458, 636 A.2d 860 (1994).[7] This court denied the petitioner's petition for certification to appeal from the Appellate Court's decision. *State* v. *Correia*, 229 Conn. 911, 642 A.2d 1208, cert. denied, 513 U.S. 898, 115 S. Ct. 253, 130 L. Ed. 2d 174 (1994). The petitioner did not raise the issue of the missing evidence at his trial, or on his direct appeal.

Subsequently, the petitioner filed a petition for a writ of habeas corpus in the United States District Court for the District of Connecticut, which was denied. The United States Court of Appeals for the Second Circuit

[6] Milzoff testified that testing of the rape crime kit could have indicated whether the samples came from a secretor or a nonsecretor. A secretor is a person whose bodily secretions, such as saliva or seminal fluid, indicate his or her blood type and other genetic markers. Milzoff also testified that the state lab also would have been able to perform microscopic analysis of the hairs collected in the rape crime kit. Milzoff testified that the rape crime kit materials, had they been tested, could have potentially eliminated individuals as suspects in the crime.

[7] In his appeal to the Appellate Court, the petitioner claimed that "(1) the trial court improperly (a) refused to give a jury instruction as required by *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and (b) refused to admit as an exhibit a prior inconsistent statement under *State* v. *Whelan*, supra [753–54]; (2) the trial court improperly required the [petitioner] to sit at the defense table and to submit to a one-on-one identification in front of the jury; and (3) the trial court improperly denied the [petitioner's] motion for a mistrial after the state indirectly commented on the [petitioner's] failure to testify in its closing argument." *State* v. *Correia*, supra, 33 Conn. App. 458.

affirmed the District Court's denial of the petition, and the United States Supreme Court again denied the petitioner's petition for certiorari. *Correia* v. *Meachum*, 201 F.3d 430 (2d Cir. 1999), cert. denied, 529 U.S. 1111, 120 S. Ct. 1965, 146 L. Ed. 2d 797 (2000).

In January, 2001, the petitioner brought the present petition for a writ of habeas corpus, claiming that his right to due process of law under article first, § 8, of the constitution of Connecticut was violated because the state had failed to preserve the collected, but untested, samples in the rape crime kit that had been taken from the victim at the hospital immediately after the attack. The petitioner contended that he did not raise this issue at trial, or on direct appeal, because at that time, this court's decisions in *State* v. *Brosnan*, 221 Conn. 788, 811–13, 608 A.2d 49 (1992), and *State* v. *Genotti*, 220 Conn. 796, 811–12, 601 A.2d 1013 (1992), had followed the United States Supreme Court's ruling in *Arizona* v. *Youngblood*, 488 U.S. 51, 57–58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), which held that in order to establish a violation of due process rights under the federal constitution, a criminal defendant must prove that the state acted in bad faith in failing to preserve potentially useful evidence. In further support of his claim, the petitioner cited this court's cases stating that the due process clauses of the United States and Connecticut constitutions have the same meaning, and impose similar limitations.[8] The petitioner admitted that he could not prove bad faith on the part of the state in failing to preserve the rape crime kit and the victim's clothing. He then contended that his due process rights had been violated under this court's decision in *State* v. *Morales*, 232 Conn. 707, 719–20, 657 A.2d 585

[8] For this proposition, the petitioner cited *State* v. *Cruz*, 212 Conn. 351, 364, 562 A.2d 1071 (1989), *State* v. *Brigandi*, 186 Conn. 521, 542, 442 A.2d 927 (1982), and *Caldor's, Inc.* v. *Bedding Barn, Inc.*, 177 Conn. 304, 314, 417 A.2d 343 (1979).

(1995), which was decided after his direct appeals had concluded. In *Morales*, this court, as a matter of state constitutional law, explicitly rejected the federal bad faith requirement in favor of a balancing test. Id. The petitioner alleged that he was prejudiced by the loss of the rape crime kit because, had it not been lost, it could have been tested, and such testing would have demonstrated that the petitioner was not the assailant. Accordingly, the petitioner also raised a claim of actual innocence. He therefore requested that the habeas court vacate his convictions.

In response, the respondent denied that the rape crime kit was still testable, and therefore potentially useful, at the time of trial—ten years after that evidence originally had been submitted by the victim. The respondent also raised, pursuant to Practice Book § 23-30 (b),[9] a defense of procedural default. Citing *Johnson* v. *Commissioner of Correction*, 218 Conn. 403, 412–13, 589 A.2d 1214 (1991), and *Jackson* v. *Commissioner of Correction*, 227 Conn. 124, 132, 629 A.2d 413 (1993), the respondent contended that the petitioner had not established cause for failing to raise his state constitutional claim at trial, and that he was not prejudiced at trial by the alleged violation of his right to due process.[10]

The habeas court, *Hon. Howard F. Zoarski*, judge trial referee, concluded that the petitioner did not prove cause for his failure to raise his state constitutional claims at trial. In its memorandum of decision, the court reasoned that the balancing test of *State* v. *Morales*,

[9] Practice Book § 23-30 (b) provides: "The return shall respond to the allegations of the petition and shall allege any facts in support of any claim of procedural default, abuse of the writ, or any other claim that the petitioner is not entitled to relief."

[10] The respondent also claimed as a defense that *State* v. *Morales*, supra, 232 Conn. 719–20, constituted a new rule that is not appropriate for retroactive application on collateral review. See *Teague* v. *Lane*, 489 U.S. 288, 310, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989); *Larkin* v. *Commissioner of Correction*, 45 Conn. App. 809, 814–15, 699 A.2d 207 (1997).

supra, 232 Conn. 719–20, was based on case law existing at the time of the petitioner's trial, namely, *State* v. *Asherman*, 193 Conn. 695, 724–25, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). Accordingly, in the view of the habeas court, "it did not create any new or novel law to excuse the petitioner from raising a constitutional issue reasonabl[y] unknown to him at the time of trial." The habeas court also concluded that the petitioner had failed to demonstrate that he was prejudiced by the loss of the rape crime kit, noting that "[s]peculation by the petitioner regarding the results of tests if the evidence had not been lost is not a substitute for reasonable probability" that the proceeding would have been different. That court also rejected the petitioner's actual innocence claim, concluding that the petitioner had failed to prove his actual innocence by clear and convincing evidence. Accordingly, the habeas court denied the petition. This appeal followed.

I

## CAUSE AND PREJUDICE ANALYSIS

The petitioner first claims that, in light of the analysis articulated in this court's 1995 decision in *State* v. *Morales*, supra, 232 Conn. 719–20, the habeas court improperly concluded that he did not establish sufficient cause for failing to raise, at trial or on direct appeal, the issue of whether the state's failure to preserve the evidence in the rape crime kit violated his state due process rights. Specifically, the petitioner contends that he had cause for failing to raise the issue at trial or on direct appeal in 1992 because, at that time, there was no reasonable basis in existing law to support the state constitutional issue addressed in *Morales*, a decision described by this court as an "issue of first impression." Id., 715. The respondent contends that a due process claim under the state constitution was not novel

because it had a reasonable basis in existing Connecticut law in 1992. We agree with the respondent and, accordingly, we affirm the habeas court's determination that the petitioner did not establish cause for failing to raise the claim at trial or on direct appeal.

A

Whether the Petitioner Had Cause for Not
Raising His State Constitutional Claim
at Trial or on Direct Appeal

"We begin by setting forth the applicable standard of review of habeas corpus proceedings. The underlying historical facts found by the habeas court may not be disturbed unless the findings were clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Questions of law and mixed questions of law and fact receive plenary review." (Citations omitted; internal quotation marks omitted.) *Duperry* v. *Solnit*, 261 Conn. 309, 318, 803 A.2d 287 (2002). Whether a claim has a reasonable basis in existing law is a question of law; accordingly, we exercise plenary review over the habeas court's ruling.

"The appropriate standard for reviewability of habeas claims that were not properly raised at trial . . . or on direct appeal . . . because of a procedural default is the cause and prejudice standard. Under this standard, the petitioner must demonstrate good cause for his failure to raise a claim at trial or on direct appeal and actual prejudice resulting from the impropriety claimed in the habeas petition. . . . [T]he cause and prejudice test is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, inadvertence or ignorance . . . . Therefore, attorney error short of ineffective assistance of counsel does not adequately excuse compliance with our rules of [trial and] appellate procedure." (Citations omitted; internal quotation

marks omitted.) *Cobham* v. *Commissioner of Correction*, 258 Conn. 30, 40, 779 A.2d 80 (2001); accord *Wainwright* v. *Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977); *Jackson* v. *Commissioner of Correction*, supra, 227 Conn. 132, 135–36; *Johnson* v. *Commissioner of Correction*, supra, 218 Conn. 409.

Under the federal cause and prejudice rubric of *Wainwright* v. *Sykes*, supra, 433 U.S. 87, the United States Supreme Court has held that "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable . . . procedures." *Reed* v. *Ross*, 468 U.S. 1, 16, 104 S. Ct. 2901, 82 L. Ed. 2d 1 (1984). In so holding, the court noted that "the cause requirement may be satisfied under certain circumstances when a procedural failure is not attributable to an intentional decision by counsel made in pursuit of his client's interests. And the *failure of counsel to raise a constitutional issue reasonably unknown to him* is one situation in which the requirement is met."[11] (Emphasis added.) Id., 14.

[11] The Supreme Court noted that its decision was grounded in concepts of both fairness and judicial economy, stating: "Just as it is reasonable to assume that a competent lawyer will fail to perceive the possibility of raising such a claim, it is also reasonable to assume that a court will similarly fail to appreciate the claim. It is in the nature of our legal system that legal concepts, including constitutional concepts, develop slowly, finding partial acceptance in some courts while meeting rejection in others. Despite the fact that a constitutional concept may ultimately enjoy general acceptance . . . when the concept is in its embryonic stage, it will, by hypothesis, be rejected by most courts. Consequently, a rule requiring a defendant to raise a truly novel issue is not likely to serve any functional purpose. . . . Raising such a claim in state court, therefore, would not promote either the fairness or the efficiency of the state criminal justice system. . . . In addition, if we were to hold that the novelty of a constitutional question does not give rise to cause for counsel's failure to raise it, we might actually disrupt state-court proceedings by encouraging defense counsel to include any and all remotely plausible constitutional claims that could, some day, gain recognition." *Reed* v. *Ross*, supra, 468 U.S. 15–16.

The court then analyzed whether a defendant or his attorney, seeking the benefit of "a constitutional principle that had not been previously recognized but which is held to have retroactive application," would have had a " 'reasonable basis' " for developing a legal theory in a given context. Id., 17. The court stated that, by definition, an attorney would not have had a reasonable basis for developing that theory if the "new constitutional rule" arose out of one of three situations: (1) the "[explicit] overrul[ing]" of a court precedent; (2) a decision "overtur[ning] a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved"; or (3) a decision that "may disapprov[e] a practice this Court arguably has sanctioned in prior cases." (Internal quotation marks omitted.) Id. The court stated that whether an attorney had a reasonable basis for pressing a claim that falls into the more nebulous third category depends on "how direct this Court's sanction of the prevailing practice had been, how well entrenched the practice was in the relevant jurisdiction at the time of defense counsel's failure to challenge it, and how strong the available support is from sources opposing the prevailing practice." Id., 17–18.

## B

### Development of the Law on Whether the State's Failure to Preserve Evidence Constitutes a Denial of Due Process Under the Connecticut and Federal Constitutions

Bearing in mind the categories articulated in *Reed* v. *Ross*, supra, 468 U.S. 17–18, we now turn to whether the state constitutional claim resolved in *Morales* constituted a novel legal issue in 1992, when the petitioner was tried and undertook his direct appeal. This analysis requires a brief review of the contemporary state and

federal case law concerning evidence lost or unpreserved by the state. We begin in 1984, with this court's decision in *State* v. *Asherman,* supra, 193 Conn. 724–26. In *Asherman,* the defendant claimed that his due process rights had been violated because he did not have the opportunity to test hair and blood samples that had been removed from his key ring; the samples had been entirely consumed during testing by the Federal Bureau of Investigation (FBI) laboratory. Id., 722–23. The FBI laboratory was not able to perform a complete analysis of the samples because there was not enough blood present. Id., 722. This court adopted a balancing test to determine whether a defendant's state and federal due process rights had been violated by the state's failure to preserve evidence, concluding that "[w]hether the defendant . . . has been deprived of his right depends upon the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." Id., 724.

The next major development occurred in 1988, with the decision of the United States Supreme Court in *Arizona* v. *Youngblood,* supra, 488 U.S. 51. In *Youngblood,* the police failed to timely test and preserve the rape crime kit and clothing taken from a child sexual assault victim. Id., 54. Noting expert testimony adduced at trial that "timely performance of tests with properly preserved semen samples could have produced results that might have completely exonerated [the defendant]"; id., 55; the Arizona Court of Appeals had reversed the conviction, concluding that "when identity is an issue at trial and the police permit the destruction of evidence that could eliminate the defendant as the perpetrator, such loss is material to the defense and is a denial of due process." (Internal quotation marks omitted.) Id., 54. The United States Supreme Court

reversed the Arizona court, and held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id., 58. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Id., 56–57 n.*.

In 1992, this court decided *State* v. *Brosnan*, supra, 221 Conn. 788, and *State* v. *Genotti*, supra, 220 Conn. 796. In *Brosnan* and *Genotti*, the defendants contended that their state and federal due process rights had been violated by the failure of the state to preserve tangible evidence. *State* v. *Brosnan*, supra, 811–13 (erasure of videotape of defendant's conduct); *State* v. *Genotti*, supra, 811 (arson testing samples). In both of these 1992 cases, this court relied on *Arizona* v. *Youngblood*, supra, 488 U.S. 57–58, and concluded that the defendants' *federal* constitutional rights had not been violated because neither defendant had proven that the police had acted in bad faith by failing to preserve the evidence at issue. *State* v. *Brosnan*, supra, 814–15; *State* v. *Genotti*, supra, 811. In both *Genotti* and *Brosnan*, however, this court resolved only the defendants' federal claims; we adhered to our long-standing practice, and we expressly declined to reach the state constitutional claims because the defendants' briefs did not contain the required separate analysis of those claims under the Connecticut constitution. *State* v. *Brosnan*, supra, 812 n.20; *State* v. *Genotti*, supra, 811–12.

Ultimately, in 1995, in *State* v. *Morales*, supra, 232 Conn. 719–20, this court had the opportunity to determine whether the *Youngblood* bad faith rule applied to due process claims arising under the Connecticut constitution. Indeed, in *Morales*, this court emphasized its willingness to entertain the defendant's state consti-

tutional claims because he had "raised this issue in a principled manner, furnishing us with a detailed analysis under a format that we have urged in raising state constitutional issues . . . ."[12] (Citation omitted.) Id., 716. On the merits of *Morales*, a sexual assault case, the defendant contended that the state had violated his due process rights under the state constitution by failing to preserve the victim's jacket, which allegedly had semen stains from the attack, but was untested. Id., 712–13. The defendant did not claim that the state had acted in bad faith by failing to preserve the jacket. Id., 712. On appeal, the Appellate Court had concluded that the *Youngblood* bad faith rule applied under the state constitution and, therefore, the defendant's state due process rights had not been violated. Id., 713.

In *Morales*, this court reversed the Appellate Court, and concluded that the balancing test of *State* v. *Asherman*, supra, 193 Conn. 724, was the appropriate analysis under the state constitution's due process clause. *State* v. *Morales*, supra, 232 Conn. 720. In so concluding, this court joined the highest courts of several of Connecticut's sister states, and expressly rejected the *Youngblood* bad faith rule.[13] Id., 725–26. Accordingly, this court

[12] In *State* v. *Morales*, supra, 232 Conn. 715, this court expressly noted that the state constitutional issue was one of "first impression for this court," and that although the issue had been raised in *State* v. *Brosnan*, supra, 221 Conn. 812 n.20, and *State* v. *Genotti*, supra, 220 Conn. 811, it was not reviewed on the merits in those cases because the defendants had failed to provide separate state constitutional analyses. *State* v. *Morales*, supra, 715 n.9.

[13] Specifically, this court concluded: "Accordingly, we, too, reject the litmus test of bad faith on the part of the police, which the United States Supreme Court adopted under the federal constitution in *Youngblood*. Rather, in determining whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the *Asherman* balancing test, weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: 'the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to

remanded the case for reconsideration of the defendant's claim regarding the lost evidence. Id., 730. Indeed, the courts of our state continue to recognize the applicability of both the *Morales/Asherman* balancing test, and the *Youngblood* bad faith rule, depending on whether the defendant's claim is brought under the state or federal constitution. See, e.g., *State* v. *Joyce*, 243 Conn. 282, 300–301, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998); *State* v. *Spillane*, 54 Conn. App. 201, 224–25, 737 A.2d 479 (1999), rev'd on other grounds, 255 Conn. 746, 770 A.2d 898 (2001).

C

Whether a Claim that Failure to Preserve Evidence
Violated the State Due Process Clause
Was Novel in 1992

Having explored the factors articulated in *Reed* v. *Ross*, supra, 468 U.S. 17–18, describing whether a claim is novel, and the development of the state and federal case law articulating when the failure to preserve evidence constitutes a due process violation, we now turn to the petitioner's claim that the habeas court improperly determined that *State* v. *Morales*, supra, 232 Conn. 719–20, did not create law novel enough to justify his failure to raise that claim in 1992 at trial or on direct appeal. We note at the outset that the petitioner's claim falls into the nebulous third category of *Reed* v. *Ross*, supra, 17–18, because *Morales*, as a case of first impression, was not the result of the overruling of long established precedent. *State* v. *Morales*, supra, 715–16.

Armed with the admitted advantage of hindsight, we conclude that, in light of the state of the law in 1992, the habeas court correctly determined that the peti-

---

the defendant caused by the unavailability of the evidence.' *State* v. *Asherman*, supra, 193 Conn. 724." *State* v. *Morales*, supra, 232 Conn. 726–27.

tioner did not have cause for failing to raise his state constitutional claim at trial or on direct appeal. We note that the petitioner was tried from April 27 through May 1, 1992, that he was sentenced on June 26, 1992, and that he undertook his direct appeal shortly thereafter.[14] Indeed, as the petitioner acknowledges, this court's decisions in *State* v. *Genotti*, supra, 220 Conn. 796, and *State* v. *Brosnan*, supra, 221 Conn. 788, were published prior to the conclusion of the petitioner's trial; the decisions were released on January 14, and April 28, 1992, respectively. Given that the statements in both cases, which were released the *same year* as the petitioner's trial, emphasizing that this court was *not* reaching the merits of the state constitutional issue because of improper briefing; *State* v. *Genotti*, supra, 811–12; *State* v. *Brosnan*, supra, 812 n.20; the conflicting standards of the state *Asherman* and federal *Youngblood* decisions, and the fact that in 1992, this court never explicitly had overruled *Asherman*, we cannot say that a claim that the failure to preserve evidence violated the petitioner's state due process rights, constituted a novel legal theory under the factors pronounced in *Reed* v. *Ross*, supra, 468 U.S. 17–18.[15] Accordingly, we conclude

[14] The petitioner had argued his direct appeal before the Appellate Court on October 29, 1993. *State* v. *Correia*, supra, 33 Conn. App. 457.

[15] Moreover, this court's landmark decision in *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992), was released on June 18, 1992, eight days before the petitioner in the present case was sentenced. This is important because *Geisler* explicitly states "tools" that the bench and bar should use "to construe the contours of our state constitution and reach reasoned and principled results . . . ." Id., 684. This court stated that "the following tools of analysis should be considered to the extent applicable: (1) the textual approach . . . (2) holdings and dicta of this court, and the Appellate Court . . . (3) federal precedent . . . (4) sister state decisions or sibling approach . . . (5) the historical approach, including the historical constitutional setting and the debates of the framers . . . and (6) economic/sociological considerations." (Citations omitted.) Id., 684–85. This court's decision in *Geisler*, therefore, provided the petitioner with the analytical tools necessary for undertaking a proper state constitutional analysis, just as he was planning his direct appeal.

that the habeas court properly determined that the petitioner did not have cause for failing to raise this claim in 1992 at trial, or on direct appeal.[16]

## II

## WHETHER HABEAS COURT USED AN IMPROPER DOUBLE STANDARD IN DETERMINING WHETHER THE RESPONDENT HAD CAUSE TO AMEND HIS RETURN

The petitioner next claims that the habeas court improperly applied a double standard in determining whether the respondent had cause to amend his return. Specifically, the petitioner contends that the habeas court violated his federal and state due process rights by permitting the respondent to amend his return, in accordance with the Appellate Court's decision in *Milner* v. *Commissioner of Correction*, 63 Conn. App. 726, 734, 779 A.2d 156 (2001), to clarify the procedural default defense, while simultaneously concluding that the petitioner did not have cause for failing to raise his state constitutional claim at trial or on direct appeal. The respondent contends that the habeas court properly concluded that the amendment of pleadings, and the avoidance of procedural default constitute two different

---

[16] The cause and prejudice standard is conjunctive. See *Cobham* v. *Commissioner of Correction*, supra, 258 Conn. 41 n.14; *Johnson* v. *Commissioner of Correction*, supra, 218 Conn. 419. Accordingly, because we conclude that the petitioner has failed to establish cause for failure to raise his state constitutional claims, we need not reach his contention that he was prejudiced by the alleged constitutional violation because the critical issue in the case was the identification of the perpetrator.

We also note that the respondent posits, as an alternate ground for affirmance, that *State* v. *Morales*, supra, 232 Conn. 719–20, is a new rule not appropriate for retroactive application to cases on collateral review because it does not satisfy the exceptions articulated in *Teague* v. *Lane*, 489 U.S. 288, 310, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), and *Larkin* v. *Commissioner of Correction*, 45 Conn. App. 809, 814–15, 699 A.2d 207 (1997). In light of our conclusion on the cause and prejudice issue, we need not reach the merits of the respondent's contention.

issues; the court, therefore, did not apply an improper double standard in its respective determinations of cause. We conclude that the habeas court did not apply an improper double standard, and that it properly allowed the respondent to amend his return.

We set forth the following additional facts and procedural history as necessary for the resolution of the petitioner's claim. In his return filed on May 11, 2001, the respondent pleaded procedural default as a defense, claiming that the petitioner had failed to establish cause and prejudice for not raising his state constitutional claim at trial or on direct appeal. Subsequently, on June 29, 2001, the respondent filed a request to amend his return. In that request, the respondent stated that he wanted his return to conform to the requirements set forth in *Milner* v. *Commissioner of Correction,* supra, 63 Conn. App. 734, which was published on June 19, 2001, and held that, "although the petitioner has the burden of proving cause and prejudice . . . that burden does not arise until *after* the respondent raises the claim of procedural default in its return." (Citation omitted; emphasis added.) The respondent stated that, although he had raised the defense of procedural default in his original return, he desired permission to plead that defense with greater specificity in light of *Milner.* Accordingly, he added to his pleading citations to cases and Practice Book § 23-30 (b). The respondent also added, as a defense, a claim that *State* v. *Morales,* supra, 232 Conn. 720, does not apply on collateral review. See footnote 16 of this opinion.

The petitioner objected to this proposed amendment, contending that the respondent did not show good cause for amending his pleading after the filing of the return, as is required under Practice Book § 23-32.[17]

---

[17] Practice Book § 23-32 provides: "The petitioner may amend the petition at any time prior to the filing of the return. Following the return, any pleading may be amended with leave of the judicial authority for good cause shown."

Although the habeas court stated that the amendment of pleadings and cause and prejudice, are "two totally different issues," the petitioner contended that the court "can't easily find cause for the state on the request to amend and then raise the hurdle and make it more difficult for me to provide cause for why [the state constitutional claim] wasn't raised earlier." The petitioner had claimed that the habeas court, by allowing the amendment, would impose a double standard that would violate his state and federal due process rights. The petitioner also had contended that, in order to interpret related provisions of the Practice Book consistently, the court must ascribe the same meaning and significance to the word "cause" as it appears in those provisions of the Practice Book governing habeas corpus petitions. Emphasizing the distinction between amending pleadings, and the substantive merits of the dispositive cause and prejudice issue, the habeas court then allowed the respondent to amend his return, concluding that *Milner*'s recent clarification of the respondent's pleading responsibilities was good cause for the amendment.[18]

We begin our analysis of the petitioner's claim by setting forth the applicable standard of review. We will not disturb a habeas court's grant or denial of permission to amend a pleading in the absence of a clear abuse of discretion. *Hasan* v. *Warden*, 27 Conn. App. 794, 798, 609 A.2d 1031, cert. denied, 223 Conn. 917, 614 A.2d 821 (1992); accord *Wagner* v. *Clark Equipment Co.*, 259 Conn. 114, 128, 788 A.2d 83 (2002). Indeed, as we recently noted: "Amendments should be made seasonably. Factors to be considered in passing on a motion

---

[18] The petitioner notes correctly that the habeas court's memorandum of decision did not address his claim that the "contradictory" rulings on cause violated his rights. The petitioner also notes that the habeas court denied his motion for articulation on this matter, a determination that the Appellate Court did not disturb upon a motion for review.

to amend are the length of the delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment." (Internal quotation marks omitted.) *Wagner* v. *Clark Equipment Co.*, supra, 128.

We conclude that the petitioner has not established that the habeas court clearly abused its discretion by allowing the respondent to amend his return. The amendment was made ten days after the release of the *Milner* decision, and well in advance of any hearing on the merits of the present case. Moreover, the amendment merely stated and cited the well established black letter law of cause and prejudice under the procedural default doctrines; inasmuch as the original return pleaded the defense of procedural default, we can not say that the amended return prejudiced the petitioner in any way. Accordingly, we conclude that the habeas court did not abuse its discretion by permitting the respondent to amend his pleading.[19]

## III

## THE PETITIONER'S ACTUAL INNOCENCE CLAIMS

The petitioner next claims that the habeas court improperly concluded that he had failed to prove his claim of actual innocence. Specifically, he contends that, under *State* v. *Morales*, supra, 232 Conn. 727, and *State* v. *Asherman*, supra, 193 Conn. 725, a legal *pre-*

---

[19] The petitioner cites a variety of authority in his brief for the fairly obvious proposition that courts have an obligation to act in an impartial manner. He contends that the habeas court failed to act in an impartial manner by finding good cause to allow the respondent to amend his return, but not finding good cause for the petitioner's failure to raise his state constitutional claim at trial or on direct appeal. We disagree with the petitioner. As the habeas court correctly noted, case management decisions, such as whether to permit the amendment of pleadings, and determinations about the ultimate issue in the case, such as the existence of cause and prejudice, present dramatically different questions for the deciding authority, a distinction that is apparent in the utilization, by the appellate courts, of various standards of review of trial court decision-making.

*sumption* arises that the untested evidence, not preserved by the state, would have exonerated the petitioner. He contends that this presumption establishes: (1) under a gateway theory of actual innocence, a reasonable probability that the verdict would have been different, but for the underlying constitutional violation; or (2) under a freestanding theory, clear and convincing evidence that the petitioner is innocent, and that no reasonable fact finder would find him guilty, even if the unpreserved evidence is not deemed a constitutional violation.[20] The respondent contends that *Morales* and *Asherman* do not create any such presumption and that, even if they did create that presumption for cases at trial or on direct appeal, such a presumption is incompatible with the heavier burden of proof shouldered by a habeas petitioner. We agree with the respondent, and conclude that unpreserved, untested evidence is not presumed to be exculpatory. Accordingly, the habeas court properly concluded that the petitioner had not proven his claim of actual innocence.

Regardless of whether the petitioner's claim is predicated on a freestanding or gateway theory of actual innocence, we note that both claims are dependent on the legal theory that he posits, namely, that under *State v. Morales*, supra, 232 Conn. 727, and *State v. Asherman*, supra, 193 Conn. 725, the unpreserved evidence is presumed to be exculpatory. In light of a dispute between the parties about whether the petitioner properly raised a gateway claim in the habeas court, and the language

[20] In *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 788 n.28, 700 A.2d 1108 (1997), this court explained the distinction between the "freestanding" and "gateway" claims of actual innocence. A "freestanding" claim is one where "there is no claim of an antecedent constitutional violation that affected the result of his criminal trial." Id. In contrast, a "gateway" claim of actual innocence "serves as a gateway to permit federal habeas review of an otherwise procedurally barred state conviction that the petitioner asserts is constitutionally flawed." Id.

of the habeas court's ultimate ruling on the actual inno-
cence issue, we will, however, analyze the petitioner's
contentions in the context of a freestanding claim of
actual innocence.[21] Accordingly, we begin our analysis
of the petitioner's claims by reviewing the legal frame-
work of a freestanding actual innocence claim.

In *Miller* v. *Commissioner of Correction*, 242 Conn.
745, 747, 700 A.2d 1108 (1997), this court held that "the
proper standard for evaluating a freestanding claim of
actual innocence, like that of the petitioner, is twofold.
First, the petitioner must establish by clear and convinc-
ing evidence that, taking into account all of the evi-
dence—both the evidence adduced at the original
criminal trial and the evidence adduced at the habeas
corpus trial—he is actually innocent of the crime of
which he stands convicted.[22] Second, the petitioner
must also establish that, after considering all of that
evidence and the inferences drawn therefrom as the
habeas court did, no reasonable fact finder would find
the petitioner guilty of the crime."

---

[21] We note that the petitioner and the respondent dispute whether the
petitioner properly raised a gateway claim of actual innocence in his petition
to the habeas court, although the petitioner has briefed both freestanding
and gateway theories on appeal. The habeas court's ruling on the actual
innocence issue is rooted in the freestanding theory, as demonstrated by
its conclusion that the petitioner failed to prove his actual innocence by
clear and convincing evidence, or to prove that no reasonable fact finder
would find the petitioner guilty of the crimes charged, and by its accompa-
nying citation to *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 747,
700 A.2d 1108 (1997). Inasmuch as both the petitioner's freestanding claim
and gateway claim are predicated on the same legal presumption, we will
analyze the legal validity of that presumption in the context of his freestand-
ing claim.

[22] The burden of proof under the clear and convincing evidence standard
is "sustained if the evidence induces in the mind of the trier a reasonable
belief that the facts asserted are highly probably true, that the probability
that they are true or exist is substantially greater than the probability that
they are false or do not exist." (Internal quotation marks omitted.) *Miller*
v. *Commissioner of Correction*, supra, 242 Conn. 794.

On appeal, the reviewing court, "after an independent and scrupulous examination of the entire record, [must be] convinced that the finding of the habeas court that the petitioner is actually innocent is supported by substantial evidence." Id., 803. The second prong of *Miller*, however, "whether no reasonable fact finder, considering the entire body of evidence as the habeas court did, would find the petitioner guilty is either an application of law to the facts or a mixed question of law and fact to which a plenary standard of review applies." Id., 805.

We note that the petitioner rests his claim entirely on a legal presumption that, the unpreserved evidence, had it been tested, would have yielded results that would have exonerated him. We now turn to assess the validity of that proposition, which the petitioner bases on a passage from *State* v. *Morales*, supra, 232 Conn. 727, in which we stated that, in balancing the four *Asherman/Morales* factors; see footnote 13 of this opinion; "[i]f . . . the evidence could have been tested to demonstrate immutable characteristics of the assailant, then the prejudice factor would weigh heavily in favor of the defendant." *State* v. *Morales*, supra, 727. The petitioner, however, in an exercise of selective quotation, apparently has overlooked the preceding and succeeding sections of the passage, which is merely a hypothetical illustration of how the *Asherman/Morales* balancing test is applied.[23] Id. Moreover, the adoption

[23] The passage provides in its entirety as follows: "In a case such as this, where the crucial issue for which the evidence would have been offered was the identity of the assailant, the court must weigh the factors in that light. If, for example, the evidence could have been tested to demonstrate immutable characteristics of the assailant, then the prejudice factor would weigh heavily in favor of the defendant. On the other hand, if the evidence would have been merely cumulative or would have failed to rebut evidence that was already available, the defendant may have suffered little prejudice, and his right to due process of law under article first, § 8, of the Connecticut constitution may not have been violated." *State* v. *Morales*, supra, 232 Conn. 727.

The petitioner also cites *State* v. *Asherman*, supra, 193 Conn. 725, in support of his proposition that the law presumes that the test, if performed,

of such a presumption that the unpreserved, untested evidence is exculpatory per se would stand in violent contradiction of the balancing principles espoused by the *Asherman/Morales* rule; by virtue of the fact that the evidence at issue is unpreserved and untested, the state could never rebut that presumption, despite the strength of its case as a result of other evidence.[24] Accordingly, we reject the petitioner's contention that this section of *Morales* creates a presumption that the unpreserved evidence, had it been tested, would have exonerated him.

Having determined that the presumption that the petitioner relies on in support of his actual innocence claim simply has no support in our law, we next turn to whether the habeas court properly concluded that he had failed to prove that claim by clear and convincing evidence. We note that, beyond this presumption, the petitioner fails to cite any evidence in the habeas or trial records in support of his actual innocence claim, and our review reveals that no such evidence was introduced at the habeas proceeding. Indeed, the petitioner did not even testify in the habeas proceedings to proclaim his innocence. Accordingly, we conclude that the habeas court properly determined that the petitioner

would have exonerated him. We do not read *Asherman* to support this presumption in any way. To the contrary, although this section of *Asherman* does state "[o]n the other hand, if the state has not tested an item of evidence before its loss or destruction, and no other facts indicate that test results might have proved unfavorable to the defendant, little more is required than a showing that the test could have been performed and results obtained which, in the context of the defendant's version of the facts, would prove exculpatory"; (internal quotation marks omitted) id.; we note that this passage, particularly its reference to other facts indicating a test result unfavorable to the defendant, is merely part of an explication of the balancing process that the court must undertake under both *Asherman* and *Morales*.

[24] The petitioner also ignores the possibility that the evidence, if preserved and tested, could have inculpated him. The loss of the evidence, therefore, did not necessarily prejudice the petitioner by putting the state in an advantageous position at trial.

had failed to prove by clear and convincing evidence that he is actually innocent, or that no reasonable fact finder would have convicted the petitioner of the crimes charged.

## IV

### PRECLUSION OF TESTIMONY BY THE PETITIONER'S EXPERT WITNESSES

We need not decide the petitioner's final claim in this appeal, which is that the habeas court abused its discretion by precluding, as speculative and irrelevant, the testimony of his two expert witnesses. These expert witnesses were offered for the purpose of explaining tests that otherwise could have been performed on the unpreserved evidence. The petitioner contends that this testimony was relevant in light of his proffered legal presumption that the results of any tests performed on the evidence would have been favorable to him, and also in demonstrating whether he was prejudiced by the loss of the evidence. We need not reach these contentions because we already have concluded that (1) the petitioner had failed to demonstrate cause under the cause and prejudice test; see part I of this opinion; and (2) Connecticut law does not recognize the presumption that, the unpreserved evidence, if tested, would have been favorable to the petitioner. See part III of this opinion.

The judgment is affirmed.

In this opinion the other justices concurred.