## IN RE JAMES NARDELLI–FIREARM SAFETY HEARING

Superior Court, Geographical Area No. 18 at Bantam
File No. CV-18-10848

Memorandum filed January 9, 2007

*Jonathan Knight*, assistant state's attorney, for the plaintiff state of Connecticut.

*Law Offices of John R. Williams*, for the defendant.

MARANO, J. On October 15, 2006, Detective Humberto Henriques and Officer Robert Guida of the Torrington police department searched the defendant James Nardelli's residence and seized four handguns, two air pistols, one air rifle, three holsters and the defendant's gun permit pursuant to a warrant issued and executed under General Statutes § 29-38c (a).[1] On October 27,

---

[1] General Statutes § 29-38c (a) provides in relevant part: "Upon complaint on oath by . . . any two police officers, to any judge of the Superior Court, that such . . . police officers have probable cause to believe that (1) a person poses a risk of imminent personal injury to himself or herself or to other individuals, (2) such person possesses one or more firearms, and (3) such firearm or firearms are within or upon any place, thing or person, such judge may issue a warrant commanding a proper officer to enter into or upon such place or thing, search the same or the person and take into such officer's custody any and all firearms."

2006, the court held a hearing to determine whether the seized items should be returned to the defendant pursuant to § 29-38c (d). Upon review of the testimony and exhibits presented, including the search warrant, police incident reports and dispatch logs, the court finds that the firearms should be returned to the defendant.

I

At the hearing the court heard the testimony of two officers, Chad David Gomez and Guida. Their testimony revealed that, over a span of three years, the defendant made twenty-eight telephone calls to the police with essentially the same complaint: a suspicious person is outside his residence either damaging his car or threatening to damage or enter his property. Subsequent police investigations revealed no evidence of vandalism or intrusion. The defendant was rarely able to describe the suspicious person. The defendant claimed that certain people from his prior residence in New York were visiting him in Connecticut and committing these acts out of a personal vendetta.

On October 15, 2006, the last time the police were dispatched to the defendant's residence, Gomez met the defendant at the front door. The defendant told them that he awakened when his motion sensors were set off, and that he could hear someone walking on his driveway and lawn. Gomez testified that a dewy frost covered the lawn grass that morning showing no sign of anyone having walked on it. Gomez later learned that the police have been dispatched to the defendant's residence twenty-eight times and that evidence was never found to support the defendant's complaints.

On cross-examination, Gomez testified that the defendant did not have a firearm on his person and was never seen brandishing a firearm. He also testified that he was never summoned to the defendant's residence for a complaint dealing with firearms, he had never

arrested the defendant and, to the best of his knowledge, the defendant had no criminal record.

Officer Guida testified that there were reports that the defendant had acquired some more firearms in June, 2006. Guida testified that in one of the defendant's previous complaints he stated that he would not hesitate to defend himself against any threat if that threat arose. Guida stated that he was concerned with the recent acquisition of the two firearms and with the potential that they could be used to confront persons coming onto the defendant's property.

Subsequent contact with the Northwest Mental Health Authority revealed that the agency had no knowledge of the defendant. He was neither a client nor was he under its care or supervision.

Guida testified on cross-examination that the defendant did not have a firearm on his person and was never seen brandishing a firearm. He also testified that there were no reports of the defendant ever shooting at vehicles or people or unlawfully discharging his firearms. He was never threatened by the defendant. Guida finally testified that when perceiving a threat or suspicious activity outside his residence, the defendant's normal course of action was to call the police.

The affidavit appended to the search warrant summarizes the investigation of the defendant's twenty-eight calls to police reporting suspicious persons or incidents. On each occasion, the police concluded that there was no basis for the complaint. The police concluded that the defendant was delusional and possibly suffered from paranoia.

The incident reports and dispatch logs also document the investigation of the defendant's complaints dating from September 25, 2003, to October 15, 2006. A November 27, 2005 report of an unsubstantiated claim of a

person outside the defendant's residence states: "[The defendant] is fearful that it 'may come down to [the intruder] or me one day' and feels it may be necessary to defend himself if things get too far."

An October 15, 2006 report states: "[The defendant] has equipped his residence with an alarm system, surveillance cameras, noise emitting motion detectors, [spotlights], a large mean rottweiler and [has acquired] two handguns . . . in June 2006." The report continues that when asked whether he would surrender his firearms to the officers voluntarily, the defendant refused, claiming that he would be defenseless, and "would not be able to defend his family should these people enter his home and shoot his wife." The defendant also stated that he has lived in fear of "these people" for years such that he and his wife would sleep in their vehicle parked in the parking lots of certain shopping centers and even the police department parking lot.

When presented with the warrant, the defendant took the officers to the bedroom and provided them with the key to a safe by his bed where the guns were stored. Near the bed, the officers also found an air rifle and one of the air pistols. While collecting the guns, the defendant commented that he could just go to Maine and get another one.

Two Northwest Mental Health Authority workers, Kathleen Tuma and Jeffrey Asmar, accompanied the officers when executing the warrant. After speaking with the defendant, it was concluded by both the officers and the workers that there was no reason to place the defendant in protective custody.

The state argues that the quantity and quality of the defendant's unsubstantiated complaints to the police over the course of three years suggest that the defendant was paranoid. This is obvious by the escalating amount of protective measures that the defendant has

taken to safeguard his home, including the threatened use of a firearm.

The defendant argues that there is insufficient evidence to prove that he poses a threat of imminent harm or danger to anyone. Specifically, the defendant argues that no evidence was introduced showing that the defendant ever threatened anyone and that no documentation of any alleged mental illness was offered.

## II

General Statutes § 29-38c (d) provides: "Not later than fourteen days after the execution of a warrant under this section, the court for the geographical area where the person named in the warrant resides shall hold a hearing to determine whether the seized firearms should be returned to the person named in the warrant or should continue to be held by the state. At such hearing the state shall have the burden of proving all material facts by clear and convincing evidence. *If, after such hearing, the court finds by clear and convincing evidence that the person poses a risk of imminent personal injury to himself or herself or to other individuals, it may order that the firearm or firearms seized pursuant to the warrant issued under subsection (a) of this section continue to be held by the state for a period not to exceed one year, otherwise the court shall order the seized firearm or firearms to be returned to the person named in the warrant.* If the court finds that the person poses a risk of imminent personal injury to himself or herself or to other individuals, it shall give notice to the Department of Mental Health and Addiction Services which may take such action pursuant to chapter 319i as it deems appropriate."[2] (Emphasis added.)

---

[2] This forfeiture provision is similar to the provision for in rem proceedings under General Statutes § 54-36h, as both assign the same burden of proof to the state in a civil action. That statute provides in relevant part: "(b) Not later than ninety days after the seizure of moneys or property subject to forfeiture pursuant to subsection (a) of this section, in connection with a

"The burden of proof under the clear and convincing evidence standard is sustained if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *Correia* v. *Rowland*, 263 Conn. 453, 475 n.22, 820 A.2d 1009 (2003). This standard is "higher than a probability but lower than beyond reasonable doubt . . . ." (Internal quotation marks omitted.) *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 791, 700 A.2d 1108 (1997).

The court is constrained to order that the seized firearms be returned to the defendant. The state has failed to show by clear and convincing evidence that the defendant poses a risk of imminent personal injury to himself or others. The state has failed to offer sufficient evidence that the defendant harbors a propensity to cause harm by firearm misuse—let alone a propensity toward "imminent"[3] personal injury.

The testimony of officers Gomez and Guida fails to identify any incidence of harm, threat of harm or general hostility displayed by the defendant. Their testimony shows that the defendant never engaged in any self-help other than outfitting his residence with a host of

lawful criminal arrest or a lawful search, the Chief State's Attorney or a deputy chief state's attorney, state's attorney or assistant or deputy assistant state's attorney may petition the court in the nature of a proceeding in rem to order forfeiture of said moneys or property. Such proceeding shall be deemed a civil suit in equity, in which *the state shall have the burden of proving all material facts by clear and convincing evidence. . . .*" (Emphasis added.) General Statutes § 54-36h (b).

[3] The statute's legislative history indicates that "imminent" means "anywhere from hours to a few days in time . . . [such that] the individual is making threats of violence broadly which do not rise to the level of a legal [or actionable] threat . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Avery*, Superior Court, judicial district of Windham at Danielson, geographical area number eleven, Docket No. 15439 (November 30, 1999) (*Foley, J.*).

security measures. The defendant's normal course of action, when he felt threatened, was always to call the police. He has no criminal record or record of reckless firearm use or misuse. He possessed a permit for the guns. In fact, the firearms were found in a locked safe when the officers executed the warrant. Although the state raises arguably significant concerns regarding the defendant's mental health and possible paranoia, no medical testimony has been offered to support this assertion. As such, the evidence is not clear and convincing in the sense required by the statute.

The court is well aware of the public policy of the state of Connecticut in protecting the safety of its citizens through gun control legislation.[4] The court, however, must follow the law, and this case has failed for lack of proof. The state has failed to introduce "clear and convincing evidence that the [defendant] poses a risk of imminent personal injury to himself . . . or to other individuals . . . ." General Statutes § 29-38c (d).

### III

### CONCLUSION

For the foregoing reasons, the court orders that the items be returned to the defendant.

---

[4] Connecticut's gun control legislation "clearly indicate[s] a legislative intent to protect the safety of the general public from individuals whose conduct has shown them to be lacking the essential character or temperament necessary to be entrusted with a weapon." (Internal quotation marks omitted.) *Dwyer* v. *Farrell*, 193 Conn. 7, 12, 475 A.2d 257 (1984); see also *Farmington* v. *Board of Firearms Permit Examiners*, Superior Court, judicial district of Hartford, Docket No. CV-95-0550258S (February 23, 1996) (16 Conn. L. Rptr. 174) (*Dyer, J.*) (same); *State* v. *Vickers*, Superior Court, judicial district of New London, Docket No. CR-98-246913 (January 21, 2000) (*Dyer, J.*) (same), aff'd, 260 Conn. 219, 796 A.2d 502 (2002). Connecticut has an "extraordinary" interest in public safety to support reasonable gun control legislation, and such interest outweighs the burden on individual liberties. See *Rabbitt* v. *Leonard*, 36 Conn. Sup. 108, 413 A.2d 489 (1979).